## Shell *v.* The State.

### *Indictment for Murder.*

1. *Dying declarations*, made by the deceased in the early part of the night on which he died, nineteen or twenty days after receiving the fatal wound, held to have been properly admitted as evidence, on the testimony of the witness to whom they were made, "that he talked about dying, and said he was going to die—that he had no hope of getting well, and no fears of the future; that he was satisfied to die, and wanted witness to attend his funeral, and to write his obituary."

2. *Statements of deceased inconsistent with dying declarations.*—Statements made by the deceased after he had received the fatal blow, which are not offered as dying declarations, but which "tend to contradict the dying declarations introduced by the State," are admissible as evidence for the defendant.

3. *Charge as to self-defense, and duty to retreat.*—The duty to retreat, if hereby the necessity of striking the fatal blow might be avoided, is not absolute, but dependent on the condition, that the defendant's danger, real or apparent, would not be thereby increased; and a charge which instructs the jury that the defendant can not be acquitted on the ground of self-defense, "if he could have retreated and avoided the necessity of striking the fatal blow," omitting the qualification as to the increase of peril by attempted retreat, is faulty.

4. *Homicide in mutual combat.*—Where the parties were engaged in a personal combat when the fatal blow was struck with a knife, the fact that the deceased was the assailant, but had no weapon, can not justify the homicide, though it may reduce the offense to manslaughter.

FROM the Circuit Court of Etowah.

Tried before the Hon. JOHN B. TALLY.

The indictment in this case charged that the defendant, Tom Shell, "unlawfully and with malice aforethought, killed George Sargent, by stabbing him with a knife." On the trial, issue being joined on the plea of not guilty, the defendant was convicted of manslaughter in the first degree, and sentenced to the penitentiary for the term of ten years. It was shown that the difficulty between the parties occurred at the mill of the deceased, on the night of December 19th, 1887; that the defendant had been told that day that the de-

ceased had charged him with the larceny of some eggs and other things, and went to the mill, in company with one Mayo, for the declared purpose of asking about it; that the deceased acknowledged that he had made the charge, and repeated it; that the defendant called him a liar, and they immediately engaged in combat. The light was extinguished during the fight, several other persons being present, one or more of whom participated in the fight; and when another light was procured, it was found that the deceased was badly cut in the neck. The defendant was also cut about the face or neck, but by whom was not proved, and he denied that he cut the deceased. It was shown, also, that the deceased "was walking about the next day, and moved his family to another house, a distance of one mile and a half;" but blood-poisoning supervened, and he died on the night of January 7th, 1888. Two practicing physicians, who were called in about five days before the death of the deceased, testified on the part of the State, that blood-poisoning had then ensued, and the wound was in such condition that they could not do anything with it; that they prescribed morphine; that two days afterwards, when they saw him again, "the morphine and the effects of the blood-poison made his mind flighty, his speech incoherent, and tended to make him irrational;" and one of them further testified, that these effects would necessarily increase until death ensued, and that, in his opinion, "Sargent was not rational for two or three days before his death." The State afterwards introduced one Mabbitt as a witness, "who was a minister of the gospel, and who testified, that he went to see Sargent the evening before his death, and thought he was then rational; that Sargent talked about dying, and said he was going to die—that he had no hope of getting well, and had no fears of the future; that he was satisfied to die, and wanted witness to attend his funeral, and to write his obituary." On this testimony, the State offered to prove, as dying declarations, statements made by the·deceased to said witness, as to the circumstances attending the difficulty; and the court admitted them, against the objection and exception of the defendant. The defendant afterwards offered to introduce, "but not as dying declarations, evidence of statements made by Sargent while on his bed sick, which tended to contradict the dying declarations introduced by the State;" and he excepted to the exclusion of the evidence by the court.

The court gave the following charge to the jury, at the in-

stance of the State:   "If, from a survey of all the evidence, the jury should find and believe, beyond all reasonable doubt, that the defendant called on the deceased, at the saw-mill, for no other purpose than inquiring about the rumor as to what deceased had said about him, and asked deceased as to what he had·said about him; and that deceased admitted having said that defendant had stolen eggs, and said it again; and that defendant then said, 'You are a liar;' and that the deceased thereupon struck the defendant; and if the jury should further find that the circumstances were such as to reasonably impress the defendant, and did so impress him, that it was necessary to strike the fatal blow, in order to save himself from the loss of life, or the infliction of great bodily harm; and if the jury should further believe, beyond such reasonable doubt, that the defendant could have retreated, and avoided the necessity of striking the fatal blow,—then he can not be acquitted on the ground of self-defense."

The defendant excepted to this charge, and requested the following charge in· writing:   ·"If the jury believe from the evidence that Shell, when he asked Sargent about charging him with stealing eggs, did so with no intention to provoke a difficulty; and that Sargent repeated the charge in substance; and that Shell said it was a lie; and that the parties then grabbed each other, and scuffled; and that, after this, the appearances and circumstances surrounding the defendant were such as to produce in his mind a reasonable belief that he was about to lose his life, or to suffer some great bodily harm, and that he had no reasonable way to retreat; then defendant could cut or strike Sargent in defense of his life, or to save his person from great bodily harm; and if the jury believe from the evidence that defendant cut Sargent under such circumstances, then the law says he is not guilty, and the jury should so find by their verdict."   The court refused this charge, and defendant excepted.

DENSON & TANNER, for appellant.—(1.) The dying declarations should have been excluded, because "they were not made under that necessity required by law."   (2.) The statements of the deceased, contradictory of said dying declarations, ought to have been admitted as evidence.—*People v. Lawrence*, 21 Cal. 368; *Wroe v. State*, 20 Ohio St. 460, 472; *McPherson v. State*, 9 Yerger, 279; *Moore v. State*, 12 Ala. 764; *People v. Knapp*, 26 Mich. 112; *Felder v. The State*, 59 Amer. Rep. 777; *Bates v. Bates*, 74 Geo. 101; Roscoe's Cr.

[Shell v. The State.]

Ev., § 36; Wharton's Cr. Ev., § 298.    (3.)   The charge given by the court is erroneous.— *Wills v. State*, 73 Ala. 362; *De Arman v. State*, 71 Ala. 351.    (4.)   The charge asked ought to have been given.—*Eiland v. State*, 52 Ala. 322; *Lewis v. State*, 51 Ala. 1; *Baine v. State*, 70 Ala. 4; *Storey v. State*, 71 Ala. 329.

W. L. MARTIN, Attorney-General, for the State.—(1.)   The dying declarations were properly admitted as evidence. *Hussey v. State*, 87 Ala. 121; 3 Brick. Digest, 226, §§ 663, 666, 672.    (2.)   All dying declarations, though contradictory, or inconsistent with each other, are competent evidence; but inconsistent statements, which do not come within the rule regulating the admission of dying declarations, are not competent.—*Moore v. State*, 12 Ala. 764; *McPherson v. State*, 9 Yerger, 279; *Maine v. People*, 16 N. Y. (9 Hun), 113; *Wroe v. State*, 20 Ohio St. 472.    (3.)   As to charge given, and charge refused, the court committed no error.—*Carter v. State*, 82 Ala. 10 and cases cited in opinion.

STONE, C. J.—Deceased received his death-wound December 19, 1887, and died January 7, 1888.    The dying declarations of deceased were introduced in evidence against the defendant, and, as we think, the Circuit Court did not err in receiving them.   If the testimony be believed, they were made under a sense of impending death.—*Hussey v. State*, 87 Ala. 121; 3 Brick. Dig. 226, §§ 663 et seq.

Defendant offered evidence of statements made by deceased after he had received the fatal blow, "which tended to contradict the dying declarations introduced by the State;" but stated it "was not offered" as a dying declaration. This evidence, on objection, was ruled out, and the defendant excepted.

There are many reasons why dying declarations should be received and weighed with great caution.   *First*, They are necessarily wanting in that greatest test of the credibility of oral testimony, cross-examination.  ·  *Second*, The jury are without the opportunity of observing the temper and manner of the declarant.   *Third*, Such testimony is generally given by relatives and friends of the deceased, who had watched by his bed-side, and bias in his favor is to be expected.   *Fourth*, All narrations of other men's sayings should be scrutinized with care, because what men say is so liable to be misunderstood.   This is shown in the fact, that when two or more

2

witnesses, no matter how respectable, attempt to repeat a conversation that was heard by each, very marked differences will frequently be observed in their several narratives. *Fifth,* Many persons, even in serious conversation, assert as facts those things of which they have only strong convictions, but have no knowledge derived from the senses. Well may we, in the language of the judges and text-writers, say, that such evidence is received from necessity, and to prevent the escape of offenders who commit the awful crime of murder.—1 Greenl. Ev. §§ 156, 162; 2 Best Ev. § 505; Wood's Prac. Ev. §§ 115, 118.

The question raised by this record has not been, heretofore, considered in this court. In *Maine v. People,* 16 Sup. Ct. N. Y. 113, and in *Wroe v. State,* 20 Ohio St. 460, it was decided that such testimony was not admissible. The ground on which the ruling was placed was, that to receive the evidence would be to allow the testimony derived from the deceased as a witness to be impeached by other variant declarations made by him, without affording him an opportunity to deny or explain what was offered to be proved as a means of contradicting him.

In the cases of *People v. Lawrence,* 21 Cal. 368; *Battle v. State,* 74 Ga. 101, and *Felder v. State,* 23 Tex. Ct. of App. 477; s. c., 59 Amer. Rep. 777, the ruling was to let in such testimony. The opinion in the case of *Lawrence, supra,* was delivered by Justice Field, now of the Supreme Court of the United States, then Chief-Justice of California. Speaking of the ruling of the trial court which had refused the evidence, he said: "It does not appear from the record on what ground the court based its ruling, and we are unable to perceive any that is at all tenable. The rule is general, that the credit of a witness may be impeached by proof that he has made statements contrary to what he has testified. There is, it is true, a condition to the application of the rule with reference to verbal statements; that the attention of the witness must be previously called to the particular occasion and circumstances under which the supposed contradictory statements were made, in order to give an opportunity of making any explanation of the matter which he may have. But this preliminary condition, it is clear, can not be complied with, where dying declarations are offered in evidence, except in very rare cases. Such declarations are generally made to the physician or friends of the deceased, in the absence of the party against whom they are offered, who, of

[Shell v. The State.]

course, has no opportunity of cross-examination, or of direct-
ing the attention of the deceased to any alleged contradictory
statements made by him.    Declarations of this character are
received with great caution.    They are admissible on the
ground of necessity; but,    .    .    .    though the condition
of the person making the declarations in the last hours of
life, under a sense of impending dissolution, may compen-
sate for the want of an oath, it can never make up for the
want of a cross-examination.    There would be no justice,
therefore, in any rule which would deprive the accused,
under such circumstances, of the right to impeach the credit
of the deceased, by proof of his having made contradictory
statements as to the homicide and its cause."

Mr. Wharton, Criminal Evidence, § 298, gives his sanc-
tion to this principle.    Speaking of the ruling in *Wroe's
Case*, 20 Ohio St. 460, he says it was of doubtful propriety.
So, Bishop, 1 Crim. Proc. § 1209, says such contradictory
statements are admissible, citing *People v. Lawrence*, from
which we have quoted.

In *Moore v. State*, 12 Ala. 764, DARGAN, Justice, deliver-
ing the opinion, it was held by this court, that when dying
declarations, made at different times, are in evidence before
the jury, and are inconsistent with each other, it is the duty
of the jury to weigh them, and to determine which, or
whether either, is to be believed.    The same doctrine was
asserted in *McPherson v. State*, 9 Yerger, 279.    See, also,
*Hurd's Case*, 25 Mich. 405; *Knapp's Case*, 26 Mich. 112;
Roscoe's Cr. Ev. (31).

Surveying the whole field, we think the Circuit Court
erred in refusing to admit the evidence offered.

There was an exception reserved to a charge given at the
instance of the State, and to the refusal to charge as re-
quested by defendant.    Each of these charges is subject to
criticism.    They are unduly long, and are, therefore, to a
mind untrained in legal learning, difficult of comprehension.
The charge given hypothesizes what we suppose was the ex-
tremest view taken in favor of the defendant, and asserts,
that even on that hypothesis, if "the defendant could have
retreated and avoided the necessity of striking the fatal blow,
then he could not be acquitted on the ground of self-defense."
This charge is probably faulty, in instructing the jury, in
the case supposed, that it was the defendant's absolute duty
to retreat, if he could thereby have avoided the necessity of
striking the fatal blow,    The parties appear to have been

[Breden v. The State.]

engaged in close combat, and there is not enough hypothesized to show that defendant could safely have attempted escape. He was not required to escape, or to attempt it, if the conditions were such that, by so doing, he would increase his peril, real or apparent.—*Carter v. State*, 82 Ala. 13.

We must not be misunderstood. There is no testimony found in the record tending to show Sargent had a weapon, or attempted to use one, unless it arise out of the fact, of which there is some testimony, that during the combat the defendant received a cut on his jaw. If Sargent was without a weapon, and was simply engaged in a fisticuff fight, that, without more, would not, in the eyes of the law, justify the defendant in taking his life. It might, in some conditions, and in the absence of formed design, reduce the homicide to manslaughter, but nothing more. Says Wharton—1 Crim. Law, § 484—"A mere assault, not directed at life or chastity, or other high right, can not excuse homicide. Hence, if a deadly weapon be not used by the assailant, or other circumstances do not exist to indicate a felonious attempt, for the assailant to take life is at least manslaughter."

There is scarcely enough testimony shown to justify the giving of the charge asked by the defendant. We have shown above what is meant by the phrases "danger to life," or "exposure to grievous bodily harm," which will excuse the taking of life when there is no other reasonable mode of escape. We think the charge was calculated to mislead, on the inquiry of what in law constitutes grievous bodily harm, exposure to which will justify the taking of life, the other conditions being present.

What we have said will be a sufficient guide on another trial.

Reversed and remanded.

*Indictment for Murder.*

