108 So.2d 177

Garfield HUTCHERSON, alias

v.

STATE.

5 Div. 521.

Court of Appeals of Alabama.

Oct. 7, 1958.

Rehearing Denied Nov. 18, 1958.

See, also, Gaddis v. State, 39 Ala.App. 630, 106 So.2d 268.

Wilbanks & Wilbanks, Alexander City, for appellant.

John Patterson, Atty. Gen., and Robt. P. Bradley, Asst. Atty. Gen., for the State.

CATES, Judge.

Hutcherson and Mattie Pearl Gaddis were, on February 6, 1957, indicted for the first degree murder of Dartis Kelly by cutting him with "a sharp instrument." Tried February 14, 1957, on a severance, he was convicted by a jury of first degree manslaughter and sentenced to two years' imprisonment.

The case for the prosecution was built around Dartis Kelly's dying declaration, wherein he stated that Mattie Pearl plunged a butcher knife in his abdomen, and this defendant hit him with a double-bit axe. There was medical testimony that the knife wound caused a blood clot that moved into his lung, thereby killing him.

Lavada Kelly was the prolocutrix for the departed Dartis, her brother-in-law. From her cross-examination, we excerpt:

"Q. Wasn't he one that something was wrong with his mind?

"Mr. Young: We object.

"The Court: Well, I'll let him ask it—that one question about it.

"A. I couldn't tell you what was the matter with him—his mind. I know what he told me. He might have been insane some from being hurt that way. In his condition hurt that way.

"Q. But before he ever got to the hospital? A. I don't know nothing about that.

"Q. What about the condition of his mind?

"Mr. Young: If the Court please, we object.

"The Court: That's objectionable. Sustained. We can't go into a man's mental condition, under circumstances like this."

Undoubtedly Lavada's answers indicate confusion as to the trend of the questioning.

■ The admission of dying declarations in homicide cases is, on the surface, an exception to the hearsay rule, the generalities being ably discussed in Cotney v. State, 32 Ala.App. 46, 26 So.2d 598. However, the declarant is the true witness and is subject to impeachment as much as any other witness. Shell v. State, 88 Ala. 14, 7 So. 40 (error to exclude inconsistent statements made after fatal blow). Carter v. State, 191 Ala. 3, 67 So. 981 (credibility).

■ A witness should not be a lunatic during lunacy, Code 1940, T. 7, § 439, Redwine v. State, 258 Ala. 196, 61 So.2d 724.

■ The trial judge decides a witness' competency, § 440 (Ib.). A presumption of competency attends a witness. If properly presented, an issue of sanity is to be decided by the court without a jury, the event of which controls competency.

■ Yet beyond competency lie weight and credibility of the testimony of which the jury are the judges.

We do not consider that the question, "What about the condition of his mind?" was confined to Dartis' lunacy at the moment of declaration, but was a preliminary question as to whether or not Lavada Kelly had any knowledge of Dartis' general mentality.

On direct examination she said she had known him "from when about that high." If her answer to the question had been affirmative, the enquiry could have gone into factors affecting weight and credibility as well as competency. For a general discussion of insanity of a witness, see Redwine v. State, supra.

This incident occurred on cross-examination. Code 1940, T. 7, § 443, first sentence, reads:

"The right of cross-examination thorough and sifting, belongs to every party as to the witnesses called against him. * * *"

While in Moody v. State, 267 Ala. 204, 100 So.2d 733, the error was in confining cross-examination touching the sanity of the defendant, yet we do not read the wide latitude rule as being confined to cases where a prisoner pleads not guilty by reason of insanity, see Judge McElroy's Relevancy of Evidence, etc., as to Mental Capacity, 4 Ala.Lawyer 384.

■ Though a dying declaration is not presumed involuntary as is an extrajudicial confession, yet it must be treated with a jaundiced eye. It is predicated on the assumption of death-bed freedom from vengefulness and mendacity. The validity

of this assumption would seem difficult of demonstration.

Thus, in Shell v. State, supra [88 Ala. 14, 7 So. 41], we find Stone, C. J., giving this warning:

"There are many reasons why dying declarations should be received and weighed with great caution. *First,* They are necessarily wanting in that greatest test of the credibility of oral testimony, cross-examination. *Second,* The jury are without the opportunity of observing the temper and manner of the declarant. *Third,* Such testimony is generally given by relatives and friends of the deceased, who had watched by his bed-side, and bias in his favor is to be expected. *Fourth,* All narrations of the other men's sayings should be scrutinized with care, because what men say is so liable to be misunderstood. This is shown in the fact that when two or more witnesses, no matter how respectable, attempt to repeat a conversation that was heard by each, very marked differences will frequently be observed in their several narratives. *Fifth,* Many persons, even in serious conversation, assert as facts those things of which they have only strong convictions, but have no knowledge derived from the senses. Well may we, in the language of the judges and text-writers, say that such evidence is received from necessity, and to prevent the escape of offenders who commit the awful crime of murder. * * *"

▮ Bearing in mind the potential frailty of a dying declaration as evidence, the latitude permissible in cross-examination, together with the wide scope of an enquiry concerning sanity, we conclude the sustaining of the objection was reversible error.

Reversed and remanded.