231 So.2d 167

**Tony Ray BROWN**

v.

**STATE.**

**3 Div. 18.**

Court of Criminal Appeals of Alabama.

Jan. 27, 1970.

No attorney for appellant.

MacDonald Gallion, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

Edwin C. Page, Jr., Evergreen, for appellant.

MacDonald Gallion, Atty. Gen., and Jasper B. Roberts, Asst. Atty. Gen., for the State.

CATES, Judge.

Murder, second degree; punishment: 20 years in the penitentiary.

The State's evidence tended to show: that on the night of December 20, 1968, Garrett Gill, Sterling Watkins (decedent herein) and decedent's son, Elmire Watkins, were driving in Gill's automobile; all three were sitting on the front seat of the car with Gill driving, Elmire in the middle and decedent next to the door. As Gill turned off a highway onto a road which lead to decedent's house, appellant in another vehicle turned in behind them and

hollered, "Stop the God damn car," then bumped into the back of Gill's car and fired a shot from a rifle. Gill then stopped at the next street and appellant pulled up on the other side.

Appellant then got out of his vehicle with the rifle and came over to Gill's car cursing and accusing Gill of almost causing him to wreck. Appellant placed the rifle against Gill's forehead and when Gill pushed it back, said, "don't you put your hands on my gun, you black son of a bitch, or I'll blow your brains out." Appellant then stuck the rifle back into Gill's car and fired it from right behind Gill's head causing a bullet to strike decedent in the forehead. Appellant then walked off cursing and said, "you better not tell no law about it because if they come looking for me, I'm going to come looking for you," then shot again. Whereupon, Gill left and drove straight to the hospital where decedent was pronounced dead.

## I

The first claim of error rests on Code 1940, T. 30, § 52 which reads:

"In civil and criminal cases, either party shall have the right to examine jurors as to their qualifications, interest, or bias that would affect the trial of the case, and shall have the right, under the direction of the court, to examine said jurors as to any matter that might tend to affect their verdict."

The occasion for appellant's claim is set out in the record as follows:

"FOLLOWING TRANSPIRED:

"THE COURT: Let the record show that the attorney for the defendant moves that the following named jurors who resided in the Repton area, to-wit: [listing five], be examined on their oaths separate and apart from other members of the jury panel respecting their knowledge of the facts of the case and any possible interest or bias they might have against the defendant and whether or not they had heard that the defendant had been convicted on a previous occasion for the offense of manslaughter in Washington County, Alabama, and given a sentence of ten years, an appeal of which is presently pending in the Court of Appeals of Alabama, and the Court declined to permit the jurors to be examined on voir dire separate and apart and the defendant notes an exception. I am going to exclude, on my own motion, the following named jurors, to-wit: [listing two from the Repton area] who since voir dire examination by the Court have stated that they had a fixed opinion as to the guilt or innocence of the defendant or felt that their knowledge of the case might bias their opinion."

The gravamen of the contention would seem to lie in the geographical fact that Repton lies on the westerly side of Conecuh County, Conecuh being bounded on the west only by Monroe.

■ Without reviewing the scope accorded by § 52, supra, which was inserted by the 1923 Code Commissioner, we cannot see any disadvantage to the defendant by putting the enquiry to the venire as a whole. All that the Constitution requires of a jury is that it be impartial, duodecimal and unanimous.

The N. Y. Court of Appeals, per Gray, J., expressed the American background of trial by jury (in part):

"* * * The institution of trial by jury is entitled to all the reverence which a custom deserves that is so historically interwoven with the growth and development of the rights of the English people. But it should be no superstitious reverence, warping and prejudicing our inquiry into the true significance and extent of the custom which has become a constitutional right. The system of trial by jury had its origin, through many sources, in the early institutions of the English people, and the provision in Magna Charta that no man should be deprived of his life, liberty, or property,

or be condemned, 'but by lawful judgment of his peers,' has been generally credited with establishing, or defining, the right of trial by jury. The correctness of this belief is somewhat open to doubt, inasmuch as the provision more probably referred to the existing custom of a trial by peers. 3 Reeve, Eng.Law, 247; Forsyth, Jury Tr. 108. In Reeves' work it is said that trial by jury was not then known. But, however that may be, it did guaranty a procedure in trials, from which, it is generally agreed, eventually sprang the modern jury system as practiced under the common law of England. That the jury should be composed of 12 persons was due to the fact that 12 was a favorite number in the earliest times for various kinds of legal ceremonies or functions, and, for its great antiquity, was held in reverence. 1 Reeve, Eng.Law, 84 et seq. It is not without interest to observe that in the earlier times the jurors were witnesses, who pronounced upon their knowledge of the facts, and it was not until the times of Edward VI. and Queen Mary that the old procedure was softened by the selection of jurors dispassionate and indifferent between the parties, before whom witnesses were called to inform their consciences. 1 Reeve, Eng. Law, 271. That special juries were known to the common law is shown in Forsyth's work on Trial by Jury (page 172), and an instance is cited, in 1450 (29 Hen. VI.), of 'a petition for a special jury; that is, jurors "who dwell within the shire, and have lands and tenements to the yearly value of xx£," to try a plea which it was supposed might be pleaded in abatement on a bill of appeal of murder.' In Rex v. Edmonds, 4 Barn. & Ald. 471, which was a criminal case tried before a special jury, it was observed of special juries by Chief Justice Abbott that it had not 'hitherto been ascertained at what time the practice of appointing special juries for trials at nisi prius first began,' and that it was 'introduced for the better administration of justice, and for securing the nomination of jurors duly qualified in all respects for their important office. It certainly prevailed long before St. 3 Geo. II. c. 25, and was recognized and declared by that statute, which refers to the former practice.' See, also, Thomp. & M.Jur. § 12. Under the provisions of St. 6 Geo. IV. c. 50, the special jurors' list was made from the ordinary jurors' book, and from among those described in that book 'as esquires, or as persons of higher degree, or as bankers or merchants.' There were statutes which, in the reigns of Henry VIII. and of Philip and Mary, authorized the impaneling of bystanders, if a sufficient number of jurors returned by the sheriff did not appear, and such a practice was very early authorized in the United States courts. See Rev.St.U.S. §§ 804, 805.

"From this brief inquiry, we would seem to be justified in saying that special, as well as struck, juries were resorted to at common law, and that the mode of selection of jurors was a matter for legislation.

"It is to be observed that our constitution does not secure to the defendant any particular mode of jury trial, nor any particular method of jury selection. It secures, simply, the right to a trial by a common-law jury of 12 men. Wynehamer v. People, 13 N.Y. 378, 458. Judge Cooley, in his work on Constitutional Law (3d Ed. p. 321), says: 'By "jury" in the constitution is meant a common-law jury. This is a tribunal of twelve persons, impartially selected for the purposes of the trial, in accordance with rules of law previously established.' In Stokes v. People, 53 N.Y. 164, 173, it was held that the mode of procuring an impartial jury 'is regulated by law, either common or statutory, principally the latter; and it is within the power of the legislature to make, from time to time, such changes in the law as it may deem expedient, taking care to preserve the right of trial by an impartial jury.' It was further said that 'the end sought by the common law was to secure a panel that would impartially hear the evidence, and render a verdict thereon uninfluenced by any extraneous considerations whatever.' In Walter v. People, 32 N.Y. 147, it was held that the

constitutional provision carried no limitation of, or restriction upon, the legislative power, except as to the right guarantied, viz. a jury trial in all cases in which it had been used before the adoption of the constitution. In the same case it was considered that, even if the right to peremptory challenges were a right given by the common law, it could, nevertheless, be restrained, or withheld altogether, at the legislative will. In People v. Petrea, 92 N.Y. [128], at page 143, it was held competent for the legislature to regulate the mode of selecting and procuring grand jurors (citing Stokes' Case),—an institution equally regarded as one of the securities of civil liberty.

"The system of trial by jury, as it grew up at common law, had its root in the endeavor to secure to a defendant a trial of his cause by a fairly-selected body of his equals, rather than by his rulers, or by magistrates, or by persons designated by them, and the usage finally obtained of taking 12 jurymen from the vicinage to judge upon the facts developed by the evidence of witnesses. The right was conceded to the citizen of having the judgment of an impartial committee, or body, of his fellow citizens, upon charges involving his life, or his liberty, or his property, and two elements became essential ingredients of the right, viz.: That the jurors should be 12 in number; and that they should be capable of deciding the cause fairly and impartially. I know of no authority, and I can perceive no good reason, for holding that there is some inherent right, superior to legislative regulation, to any particular mode by which the panel of jurors is returned from which the 12 are to be chosen to sit. The ordinary reading of the constitutional provision does not suggest it, and the decisions of this court in the cases referred to negative the idea. That the mode of selecting a jury is within legislative regulation, and that it is not necessary,

in order to preserve the right of trial by jury, to preserve any particular mode of designating jurors, however such mode may have been previously in force, is a doctrine which has received the support of the decisions of courts in other jurisdictions. * * *" People v. Dunn, 157 N.Y. 528, 52 N.E. 572, 43 L.R.A. 247.

The mode of jury selection is basically one only of statutory choice. Our law provides for struck juries.[1] McGee, Selecting the Jury in Criminal Cases—Some Common Law Aspects, 5 Ala.Law Rev. 213.

In criminal trials since 1909, peremptory challenges have been abolished. Holman v. Baker, 277 Ala. 310, 169 So.2d 429. Seemingly the struck jury takes the place of such arbitrary objection. Challenges for cause, statutory or common law, remain in effect. Beasley v. State, 39 Ala.App. 182, 96 So.2d 693; Herndon v. State, 2 Ala.App. 118, 56 So. 85.

The struck jury comes from a venire list drawn from the box in which all on the roll are represented by individual cards. Code 1940, T. 30, §§ 20, 21, as amended; § 30.

We are not confident that § 52 contains a categorical directive to require a trial judge to put questions framed by counsel to a jury. This purports to be left to the judge's discretion both in Gholston v. State, 221 Ala. 556, 130 So. 69 and Ballard v. State, 236 Ala. 541, 184 So. 260. Yet in Aaron v. State, 273 Ala. 337, 139 So.2d 309, which quotes from Burns v. State, 226 Ala. 117, 145 So. 436, it was held that refusal to permit defense counsel to "personally interrogate each prospective juror" was within the judge's discretion. See Anno., 73 A.L.R.2d 1180.

We quote from Seals v. State, 282 Ala. 586, 213 So.2d 645:

"The court did not err in overruling a motion of an attorney for the defendant

[1]. Code 1940, T. 30, § 60 (felonies not capital and misdemeanors); § 64 (capital cases); § 54, as amended, (civil actions); see Holman v. Baker, 277 Ala. 310, 169 So.2d 429; Donahey v. City of Montgomery, 43 Ala.App. 20, 178 So.2d 832.

below that he be permitted 'to examine each prospective juror outside the presence of the other jurors.' Jurors may be qualified on voir dire in groups at the discretion of the trial court. See Burns v. State, 226 Ala. 117, 145 So. 436; Aaron v. State, 273 Ala. 337, 139 So.2d 309.

\* \* \* \* \* \*

"\* \* \* We have said that § 52, Title 30, supra, does not empower the parties to require the court to put questions to the jury touching matters which might tend to affect their verdict—Ballard v. State, 236 Ala. 541, 184 So. 260. But we have said that it is within the discretion of the trial judge as to whether he will question the venire of jurors as to matters which tend to show interest or bias not amounting to disqualification, whether or not he is requested by counsel to do so.—Beecher v. State, 280 Ala. 283, 193 So.2d 505, \* \* \*. The trial court propounded to the prospective jurors, in groups, most of the questions which counsel for defendant requested it to do. See Aaron v. State, 273 Ala. 337, 139 So.2d 309."

Anciently Blackstone, iii Com. 359 speaks of the disappearance of challenge for defect of hundredors:

"\* \* \* Thus the Gothic jury, or nembda, was also collected out of every quarter of the country: 'binos, trinos, vel etiam senos ex singulis territorii quadrantibus' (two, three, or even six, from every quarter of the country). (s) For living in the neighbourhood, they were properly the very country, or pais, to which both parties had appealed; and were supposed to know beforehand the characters of the parties and witnesses, and therefore they better knew what credit to give to the facts alleged in evidence. But this convenience was overbalanced by another very natural and almost unavoidable inconvenience; that jurors, coming out of the immediate neighbourhood, would be apt to intermix their prejudices and partialities in the trial of right. \* \* \*"

Thus, though veniremen from Repton where Brown lived might more probably know of his repute, nonetheless the problem of partiality vel non would not have been inexorably confined to that community. That the defendant was convicted three counties away for manslaughter might more probably have been known in Repton. However, a more generalized question could have been put to the whole array without spreading this particular derogatory fact before all the venire. As a practical matter, § 52, supra, admits of so many avenues of questioning that a trial judge seldom, if ever, can be held to reversible error thereunder. Ward v. State, 44 Ala.App. 229, 206 So.2d 897.

We quote from Johnson v. State, 43 Ala.App. 613, 197 So.2d 466:

"\* \* \* Defense counsel moved the court to sequester the jurors for the purpose of interrogating them on their bias or lack of bias in the case. The court denied the motion, but again offered to address any questions requested by defendant to the qualifications of the jury as a body.

"Defendant insists the refusal of the court to permit each juror to be examined out of the presence of the remainder of the panel constitutes reversible error. We do not agree. 'It is the rule of our cases that the limit of voir dire examination is left much to the discretion of the trial court.' Sims v. Struthers, 267 Ala. 80, 100 So.2d 23; Aaron v. State, 273 Ala. 337, 139 So.2d 309. We find no abuse of discretion here."

Also, McPhearson v. State, 271 Ala. 533, 125 So.2d 709:

"Perhaps we should observe that the trial court did not abuse its discretion in refusing the appellant's request to examine each juror individually after the court had qualified the jury. The court

advised the appellant that he could examine the jury as a whole and this procedure was pursued. Burns v. State, 226 Ala. 117, 145 So. 436. See Rose v. Magro, 220 Ala. 120, 124 So. 296; Alabama Clay Products Co. v. Mathews, 220 Ala. 549, 126 So. 869."

## II

Brown pled not guilty and not guilty by reason of insanity.

Along with other proof, the defense put Dr. D. E. Owensby on the stand to meet the burden of this latter plea. The State took Dr. Owensby on cross and at R. 124 we are referred to the following:

"Q Do you think that he was giving you his answers as best he could give them and wasn't hiding anything from you?

"A No, I think I could have delved into this deeper and I didn't question what he told me. I just asked the general questions and I took whatever he told me and went on. By going back and cross questioning him a little more closely, I could have probably gotten more information.

"Q Did you question him about whether or not he had ever been convicted of a penitentiary offense?

"MR. PAGE: I object, Your Honor.

"THE COURT: Overrule the objection.

"MR. PAGE: I reserve an exception.

"A I did not."

■ Strictly, the fact, vel non, of a conviction was not relevant to a psychiatric enquiry as distinguished from the doctor's going into the details of his patient's conduct for which the law might have brought him to book. Nevertheless, the other party may cross examine an expert witness as to the depth of his investigation. But the enquiry goes only to the basis of the physi-

cian's opinion, not the patient's conduct. McElroy, Evid. (2d ed.), § 110.01(2).

■ The instant contention of prejudice is moot because the answer was negative. Anderson v. State, 44 Ala.App. 388, 210 So.2d 436(8); Carr v. State, 43 Ala.App. 642, 198 So.2d 791.

## III

In his brief, appellant continues as follows:

"Another proposition involved in this appeal on which the Appellant relies for reversal of this case appears on page 103 of the Transcript. The Defendant placed on the stand, as one of his witnesses, Kenneth Lovett, and Lovett testified that he had known the Defendant, Tony Ray Brown, and that they drank together and on occasion, excessively. He testified about Tony Ray Brown and the witness spending the night in the graveyard, and that Tony Ray Brown had gone to sleep on a tombstone and stayed there all night. On cross-examination, the Defendant objected to the question asked the witness, by the District Attorney 'Did you plead insanity in your case when you came up here in Court?' The Court overruled the objection and we think wrongly so. We point out that the witness was not on trial. In the case of Brewer vs. State, 15 Ala.App. 681, 74 So. 764, the third head note states 'an officer's testimony that he had a warrant and searched for accused's witnesses is inadmissible, being irrelevant and calculated to discredit the witness.' By the same token we state that the sole purpose of this testimony was to discredit the witness, Kenneth Lovett; that whether this witness plead insanity or did not plead insanity in any case he had in Court, was wholly irrelevant to this case. * * *"

Lovett's testimony on direct examination related only to his acquaintance with Brown. Lovett, for the three years last past, had been in Escambia County and,

consequently, had not seen Brown in that time. Hence, we consider that his evidence was relevant only to Brown's plea of insanity even though it did not in any degree portray alcoholic conduct which might have supported an inference which might come from symptoms such as those characterized as Korsakoff's psychosis.

Because Lovett answered "no," there is nothing to bring this case within the principle of Code 1940, T. 7, § 440, which reads:

> "The court must, by examination, decide upon the capacity of one alleged to be incompetent from idiocy, lunacy, insanity, drunkenness, or infancy."

■■ Had Lovett answered in the affirmative, the State could then have challenged Lovett's competency before the judge. The party offering the witness vouches for his credibility. Equitable Life Assur. Soc. of United States v. Welch, 239 Ala. 453, 195 So. 554 (11).

■ Even if the witness is competent, his mental condition could go to the credit and weight of his testimony. Redwine v. State, 258 Ala. 196, 61 So.2d 724; Garrett v. State, 268 Ala. 299, 105 So.2d 541; Hutcherson v. State, 40 Ala.App. 77, 108 So.2d 177.

In the leading case of Madden v. State, 40 Ala.App. 271, 112 So.2d 796, Harwood, P. J., wrote:

> "It is the clear right of the cross-examining party to elicit facts which weaken or qualify the case of the party examining in chief, or support the case of the cross-examining party. One of its chief functions is to test the credibility of the deposing witness. 1 Thompson on Trials, 2nd Ed., Sec. 348.
>
> "In Alabama, the so-called English Rule of cross-examination prevails, that is, the cross-examination is not limited to matters brought out on direct examination

of a witness, but extends to all matters within the issues of the case. * * *"

■ No contention appears that the District Attorney asked the question mala fide. From the direct examination, the prosecution, if any, for being drunk in the graveyard could have been had (a) before Mr. Jones took office; (b) in a court to which he was not required to attend; or (c) both. On this record, we consider the question was permissible as a threshold question and legitimate cross examination. *Hutcherson,* supra.

### IV

The following proposed written instructions tendered by defense counsel were refused by the trial judge:

> "7. The Court charges the Jury that if the Jury finds from the evidence that the Defendant, Tony Ray Brown, killed the deceased, Sterling Watkins, without malice, the Jury cannot convict the Defendant of Murder.
>
> "15. The Court charges the jury that there is a legal presumption of innocence which is to be regarded as a matter of evidence by the jury to the benefit of which the accused is entitled, and as a matter of evidence it attends the defendant until his guilt is, by the evidence, placed beyond a reasonable doubt.
>
> "15. The law presumes the Defendant is innocent of the charge against him and this presumption of innocence is evidence in his behalf to be considered by you, and you cannot find him guilty, until, from the evidence, his guilt is established to your reasonable satisfaction, and beyond a reasonable doubt.
>
> "17. The Court charges the Jury that the law presumes the Defendant to be innocent of the commission of the offense charged in the indictment, and this presumption continues in favor of the Defendant until the evidence convinces the jury, beyond a reasonable doubt, of his guilt; and you cannot find the defendant guilty of any offense charged in

the indictment until the evidence in the case satisfies you, beyond *all* reasonable doubt, of his guilt; and you cannot find the Defendant guilty of any offense charged in the indictment until the evidence in the case satisfies you, beyond all reasonable doubt, of his guilt; and so long as you, or any of you, have a reasonable doubt as to the existence of any of the elements necessary to constitute the offense, you should not find the defendant guilty." (Italics added; see Alldredge v. State, ante p. 171, 227 So.2d 803.

■ As to Charge 7, we note that in his general charge the trial judge excluded malice as an ingredient of voluntary and involuntary manslaughter. Since the verdict was for second degree murder, the oral charge as to murder in the first degree is functus officio.

On second degree murder he, having theretofore discussed malice, charged specifically:

"The indictment also contains murder in the second degree and I want to tell you the difference between murder in the first degree and murder in the second degree. Murder in the second degree is the wilful and malicious killing of a human being without premeditation or deliberation. It means that the person may not have thought of or premeditated the killing but he must do it wilful and with a fixed hate or under such presumption as in your mind would raise a presumption of malice. That is the distinction—there is no premeditation or deliberation in murder in the second degree."

Manslaughter in both degrees the oral charge defined as follows:

"Thirdly, this indictment charges what is known to the law as the offense of manslaughter in the first degree. Manslaughter in the first degree is the unlawful and voluntary killing of a human being *but without malice,* either express or implied.

"Fourthly, we have contained in this indictment the offense of manslaughter in the second degree. That is, in the law, known as involuntary manslaughter. It is the unlawful killing of a human being by another without *malice, either express or implied,* and without any intent to kill or permit injury causing death committed accidentally in the commission of some act not feloneous or in the improper or negligent performance of an act lawful within itself."

There was no error in refusing to give requested Charge 7. Code 1940, T. 7, § 273, fourth sentence.

■ In the general charge, we find the following paragraph:

"The defendant in this, as in every criminal case, is presumed by law to be innocent and this presumption attends him as a matter of evidence throughout the trial and may protect him from a verdict at your hands unless and until the State of Alabama, by the evidence from the witness stand, convinces you of his guilt beyond a reasonable doubt and to a moral certainty. If that state of affairs is reached, of course, then this presumption of innocence would fail and would no longer protect him from a verdict at your hands."

Inasmuch as this direction meets the requirements laid down in Davis v. State, 284 Ala. 135, 222 So.2d 719, we find no error in the refusal of Charges 15 and 16.

■ Charge 17 was too favorable to the defendant because it puts the balance of probabilities "beyond *all* reasonable doubt." *Alldredge,* supra.

V

From the record we quote:

"DURING THE COURSE OF STATING THE CASE TO THE JURORS, THE FOLLOWING OCCURRED:

"THE DISTRICT ATTORNEY

"(MR. JONES): —poisoning or lying in wait—

"MR. PAGE: Your Honor, we object to the District Attorney talking about poisoning and lying in wait, none of which is involved in this case whatsoever and we object to him referring to poisoning or lying in wait.

"THE COURT: Mr. Jones, come on down to the specific point. He has said in his argument, Mr. Page, that he wasn't claiming that.

"MR. PAGE: We reserve an exception to Your Honor's ruling and furthermore move for a mistrial.

"THE COURT: Overrule your motion."

We consider this remark too fragmentary to put the trial judge in error. If the District Attorney were alluding to the statutory definition [2] of first degree murder, then whatever error (albeit anticipatory) was cured by verdict. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; Coleman v. State, 284 Ala. 553, 226 So.2d 333.

Pretermitting for the moment speculation as to the District Attorney's full statement, the statement if made as a claim of forthcoming evidence of killing by means of "poisoning or lying in wait," was argumentatively more damaging to the prosecution. This because of the failure to prove such an asseveration.

VI

In brief appellant argued:

"On page 4 and 5 of the Transcript appears the motion of the Defendant stating that he was mentally impaired and insane by reason of such insanity moved the Court that he be transferred for mental examination to the Alabama State Hospital for the Insane at Tuscaloosa, as provided by Section 426 Title 15, et sequitur of the Code of Alabama. We have cited the cases under our Citation of Authority. At the time this motion was made, being at the time the Defendant was arraigned, testimony and support thereof was offered by his mother and proof was made, not only of the existence of insanity in the family of the Defendant on his mother's side, but proof was offered of the conviction of the Defendant for Manslaughter in the first degree in a case tried in the circuit court of Washington County, Alabama. The Court overruled this motion of the Defendant and we cite in support of our position cases cited elsewhere in this Brief under the Citation of Authorities. We call the Court's attention to the case of Hawkins vs. State, 267 Ala. 518, 103 So.2nd 158, where the Supreme Court held that in a prosecution for murder where the Defendant interposes pleas of not guilty by reason of insanity and report of a lunacy commission who examined the Defendant was executed more than seven (7) months after the members of the Commission had seen the Defendant, and no diagnosis was made while the Defendant was confined in the mental institution, trial judge did not act arbitrarily in permitting Defendant to be put to trial in spite of the opinion expressed in the report that the Defendant was not mentally capable of participating in his defense. The effect of this decision which was handed down in 1958 is to still allow a Jury to pass upon the

2. "Every homicide, perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or the attempt to perpetrate, any arson, rape, robbery, or burglary, or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, is murder in the first degree; and every other homicide, committed under such circumstances as would have constituted murder at common law, is murder in the second degree." Code 1940, T. 14, § 314.

guilt or innocence of the Defendant regardless of whether or not a lunacy commission as provided by Sections 425, 426 of Title 15 of the Code of Alabama, acts or not. In view of this, the Defendant argues that it could not possibly have harmed the State to allow this lunacy commission as provided by the statute to examine the Defendant over at Bryce Hospital. He would have been looked after and an opinion as to his insanity would have been rendered."

 Counsel filed a motion for a psychiatric enquiry under Code 1940, T. 15, § 425.

In support of his motion it was averred that a number of Brown's kin on his mother's side exhibited mental or emotional aberrations. Some of these relatives were in mental institutions; an uncle was dumb; a 17 year old sister, because of a nervous condition, was unable to continue in school and required the attendance of a physician.

In Pace v. State, 284 Ala. 585, 226 So.2d 645, Merrill, J., assured that the appellate courts of Alabama review the actions of trial judges under § 425, supra, to guard against the abuse of discretion.[3] There he wrote:

" * * * The legislature has not given a right to a defendant to receive a mental examination whenever he requests one. Absent such a right, machinery for screening requests must exist. The legislature has made the trial court this screening agent. We cannot say under our past cases that the appellant's showing was so compelling that the trial court abused its discretion in denying this petition. The trial court held a hearing, listened to the witnesses and made a decision. It might have decided either way on the question of whether the hearing produced any real evidence of legal insanity or legal incompetence. Its decision was not arbitrary or unsupported by reason or fact. We conclude

that the trial court did not abuse its discretion."

Regardless of the abstract concept of what standards must be employed to demark use from abuse, we consider that the case of instant concern failed to show any jurisdictional fact to invoke § 425.

There was no evidence to show that insanity is inexorably inherited. Failing credible expert testimony to that effect the motion's lack of proof of anything else except the defendant's criminal propensity did not in our opinion present more than a scintilla of proof.

We have carefully considered the entire record under requirements of Code 1940, T. 15, § 389 and conclude the judgment below is due to be

Affirmed.

---

3. The writer of this opinion does not agree with Mr. Justice Merrill's interpretation

of Krappatsch v. State, 44 Ala.App. 549, 216 So.2d 188.