TYSON, Judge.
Thomas Durwood Trenor was indicted for the first degree murder of Patricia Ann Trenor by shooting her with a pistol. The jury found appellant guilty as charged and fixed punishment at life imprisonment in the penitentiary. The trial court then entered judgment in accordance with this verdict.
John Granger testified that he was a police officer with the City of Pleasant Grove on July 1,1976. Granger stated that he and Officer Thomas Perkins worked the 3:00 to 11:00 p. m. shift on that date. Granger testified that he responded to a call at 1153 First Avenue, around 10:00 p. m. When he arrived Officer Perkins was already on the scene. Granger testified that Mrs. Patricia Trenor was lying on her back on the kitchen floor with a chest wound that was causing severe bleeding. Granger indicated that he found a spent cartridge (shell casing) on top of the stove in the kitchen. Also, according to Granger, there was a deep groove “in the refrigerator face.” He stated that a spent projectile was found in the kitchen wall. Granger also testified that the appellant’s nephew, Jack Trenor, led him to a back bedroom in the house where he revealed a forty-five caliber semi-automatic Remington Rand pistol, Serial Number 2461011, which was under a mattress. Granger indicated there were four bullets in the clip of the pistol. Further, there was a bullet in the chamber. Granger testified that he turned these items, along with several articles of clothing, over to the State Toxicologist in Birmingham. Granger stated the appellant was in the kitchen when he arrived and appeared to be very upset. Granger stated that he placed the appellant under arrest and advised him of his “Miranda" rights there at the house. Later that evening, *1182 according to Granger, the appellant gave a written confession at Police Headquarters.
George Allen Davis testified that he was a sergeant with the Pleasant Grove Police Department. He stated that on July 1, 1976, he arrived at work around 10:20 p. m. Davis stated that he took possession of deceased’s clothing around 1:00 a. m. on July 2,1976, at University Hospital. Davis indicated that he wrote down appellant’s confession at Police Headquarters around 3:00 a. m., after appellant signed the waiver of rights form.
W. S. Allen, Assistant Coroner of Jefferson County, stated that he examined the deceased, Patricia Trenor, at the University Hospital in Birmingham, Alabama. Allen testified that the deceased had a gunshot wound in her chest and an exit wound in her back. According to Allen, the deceased died as a result of internal bleeding from these wounds.
Jeff Trenor testified that he was the son of Thomas and Patricia Trenor. He stated that his parents were divorced at the time they gave him a birthday party at his father’s residence on July 1,1976. Jeff stated that after the party he went over to a friend’s house to help him fix a motorcycle. Jeff testified that he came home later that evening with his friend and noticed his father and mother in his mother’s car in front of the house. He stated that shortly after he and his friend went inside the house he heard his mother scream. Jeff testified that he looked outside and saw his mother running toward the house with his father following. According to Jeff, his father (the appellant) had a gun in his hand. Jeff testified that his parents went in the kitchen and he (Jeff) went in the den. Jeff stated that he looked through an opening in the wall between the kitchen and den and saw his grandmother, Viva Langley, holding his father around the neck. According to Jeff, his father told Langley that the gun was empty and that he was not going to hurt her. Jeff stated that his father would ask his mother questions, and if his father did not like the answers which she gave he would point the gun at her. Jeff testified that his father told his mother he was going to “kill her,” and at that point his father raised the pistol, pulled the hammer back with both hands, and shot her. Jeff stated that he ran outside, and his father came out and told him to call an ambulance. Jeff testified that around 5:30 p. m. on that same evening his father told him that his mother was seeing another man.
Michael Penney, age fifteen, testified that he went to the birthday party for Jeff at appellant’s home around dusk. Penney stated that after the party he and Jeff went down the street to Dale Morgan’s house to repair a motorcycle. Penney testified that he and Jeff came back to appellant’s home shortly thereafter. Penney stated that he was talking to his stepfather on the phone at appellant’s home when Mrs. Patricia Trenor came in the kitchen and told Mrs. Langley (appellant’s mother) that appellant was going to kill her (Patricia Trenor). According to Penney, he told his stepfather he had to leave, hung up the phone, and went outside. Penney testified that he came back inside with Jeff and saw appellant hold up a pistol with both hands and shoot Mrs. Patricia Trenor.
Lawton Yates, Criminalist with the Alabama Department of Toxicology, testified that on July 7, 1976, he received several items of clothing, a projectile, a spent cartridge case, and a .45 caliber semi-automatic pistol from Officer Granger. According to Yates, the spent projectile and cartridge were fired from the .45 caliber semi-automatic pistol he received from Granger. Also, according to Yates, the .45 caliber semi-automatic pistol would project gunpowder residue from thirty-six to forty-five inches. Yates stated that no such residue was found on deceased’s clothing.
Steve Trenor testified that he was the appellant’s son and was nineteen years of age. Trenor stated that he attended his maternal grandmother’s birthday party on June 26, 1976. According to Trenor, the appellant and Mrs. Trenor had a lengthy conversation. Trenor testified that after his mother and the appellant finished talk *1183 ing, his father told him that he was going to do away with all of them.
Jack Trenor testified that he was the appellant’s nephew. Trenor stated that he lived at appellant’s home in July of 1976. He testified that he went to bed on the night in question around 9:00 p. m. According to Trenor, he was awakened by the sound of a gunshot. Trenor stated that he got out of bed, went to the kitchen, and saw his uncle crying. Trenor testified that he put the pistol in his bedroom under the mattress.
Viva Langley testified that she lived at 1153 First Avenue, Pleasant Grove, Alabama, and that she was the appellant’s mother. Langley testified that she was in the kitchen on the night in question when Patricia Trenor came in and said, “Tommy’s got a gun (R. p. 241).” According to Langley, the appellant came in shortly after-wards and put his left arm around Patricia Trenor. Langley testified that the appellant had the pistol in his right hand. Langley then testified to the following (R. pp. 242-243):
“A. He told her that — he said, ‘Pat, you know I wouldn’t hurt you,’ he said ‘I’m not going to shoot you, you know I wouldn’t hurt you.’
“Q. All right. What was the next thing that was said?
“A. I caught hold of his right arm and asked him to let me have the gun.
“Q. What statement did he make to you?
“A. He said, ‘No, mama.’
“Q. And would you describe to the jury, tell the jury what Pat said or did?
“A. She walked up to the stove and put her hand on it just like that, kind of bent over leaning over a little bit, that’s when I went back to get Jack.
“Q. Was Pat crying at that time?
“A. Yes, sir.
“Q. Where was Tommy at that time?
“A. He was standing there beside her.
“Q. Did he have his hand on her any place?
“A. Not at that time he didn’t.
“Q. All right. Now, after you took hold of Tommy’s right hand and told him to give you the pistol and he told you he wasn’t going to hurt Pat, where if anywhere did you go?
“A. I went through the den back to the bedroom to get Jack, started back there to get Jack, my grandson.
“Q. Would you describe to the jury how you walked? Did you walk slow or fast?
“A. I walked fast.
“Q. And while you were walking through the den or back into that general area did you see or hear anything?
“A. Before I got to the door, the door to Jack’s room, I heard the shot.
“Q. And do you have any judgment as to how many seconds it was from the time that you left the kitchen going back here toward the den until you heard the shot?
“A. I’d say four or five seconds.”
Langley stated that she saw neither Jeff nor his friend in the den when she came back into the kitchen. Langley testified that Patricia Trenor was on the floor and the appellant was standing over her crying.
Thomas Durwood Trenor testified that around 9:30 p. m. Patricia Trenor said she was going to leave the party. The appellant stated that he told her he would walk out to the car with her since he had to go to work anyway. According to the appellant, he got his lunch box and pistol, which he always took to work, then walked out to Patricia Trenor’s car. The appellant testified that he and Patricia Trenor sat in her car and talked about her coming back and getting the marriage patched up. According to the appellant, Patricia Trenor told him that she might go over and spend the night with a Mr. Harrington. The appellant testified that he asked her if she had ever spent the night with Harrington before, and she replied that it was none of his business since they were not married anymore. According to appellant, he told her that he had rather be dead than live as he was, then picked up the pistol. He indicated that Patricia Trenor got scared and ran to the house. The appellant testified *1184 that he came in the house behind her and followed her into the kitchen. According to the appellant, his mother (Langley) grabbed him by the arm, and he told her he was not “going to hurt Pat (R. p. 270).” The appellant testified that he had his arm around Patricia Trenor and was trying to show her that the gun was on safety. The appellant stated that Patricia Trenor grabbed the pistol with both hands, and when he jerked the gun back it went off. According to appellant, he telephoned the operator and requested that an ambulance be sent right away.
I
The appellant contends that the trial court committed reversible error in refusing several written requested charges which were not covered by either the oral charge or other written charges.
Written requested Charges Nos. 25, 27, and 31 were to the effect that, if the shot which killed the deceased was accidentally fired, the jury cannot convict the defendant of manslaughter in the first degree, murder in the second degree, or murder in the first degree. Such charges were faulty for the reason that they failed to define the meaning of the word “accidentally.” Gautney v. State, 284 Ala. 82, 222 So.2d 175; Dobbins v. State, 274 Ala. 524, 149 So.2d 814; Garrett v. State, 268 Ala. 299, 105 So.2d 541.
II
The appellant contends that the trial court committed reversible error in refusing to give Charges Nos. 33, 39, and 41, all of which contain the language, “beyond all reasonable doubt.”
Such charges were too favorable to the appellant since the State must only prove its case beyond “a reasonable doubt,” not “ail reasonable doubt.” Hence, such charges were properly refused. Breazeale v. State, 51 Ala.App. 320, 285 So.2d 130; Alldredge v. State, 45 Ala.App. 171, 227 So.2d 803; Brown v. State, 45 Ala.App. 391, 231 So.2d 167.
III
Charge No. 22, which was refused by the trial court, reads as follows (R. p. 328):
“You are instructed that the charges of murder in the second degree and manslaughter in the first degree are also embraced in this indictment.
“Murder in the second degree is the willful, unlawful killing of another human being with malice aforethought but without deliberation or premeditation.
“Manslaughter in the first degree is the unlawful, voluntary killing of another human being without malice. In manslaughter in the first degree there must be either a positive intention to kill, or an act of violence without just cause or legal excuse from which ordinarily, in the usual course of events, death may ensue. “Before you may convict the defendant of any charge embraced in this indictment, you must be convinced from the evidence beyond a reasonable doubt of each and every element of the offense charged.”
This is an incorrect statement of applicable law. The correct statement is contained in Harrington v. State, 83 Ala. 9, 16, 3 So. 425, 428, as follows:
“. . . In order to constitute manslaughter in the first degree, there must be either a positive intention to kill, or an act of violence from which, ordinarily, in the usual course of events, death or great bodily injury may be a consequence.” (Emphasis added)
IV
We have carefully examined the remaining refused charges and find that they were fully covered in the trial court’s oral charge and therefore their refusals were without error. Title 7, Section 273, Code of Alabama 1940.
Our careful examination of this record reveals no error. The judgment of the trial court is therefore
AFFIRMED.
All the Judges concur.