On August 16, 1970, Charles Ray Lovett disappeared from his home in Decatur. His skeletonized remains were unearthed in Sanford, Florida, on December 9, 1977. The defendant was indicted and convicted for the first degree murder of Lovett. Because the evidence is insufficient to connect the defendant with the killing of Lovett, we reverse that conviction.
On appeal the State adopts the statement of facts set forth in defendant's appellate brief as "substantially correct". In arguing the issue on the insufficiency of the evidence the State recites those facts which it alleges support the inference of the defendant's guilt. The State's own factual statement reveals the glaring insufficiency of the evidence to connect the defendant with the crime. From the State's appellate brief:
"The prosecution began its case by proving a motive for the murder. Morgan County Circuit Clerk Cleo Teague took the stand and testified that in March, 1970 Appellant was indicted for grand larceny of Charles Ray Lovett's automobile; Lovett was listed on the back of the indictment as a witness for the State and Lovett's address was also shown on the indictment. Moreover, at the time of Lovett's disappearance the grand larceny charge against Appellant was still pending.
"The testimony of J.R. Garrett showed that Appellant was in the State of Alabama during the months of July-August, 1970. In early August Garrett observed Appellant proceeding with a piece of paper in his hand to Freemont Street where Lovett resided; Appellant glanced up and down the street as if trying to ascertain precisely where Lovett lived, then turned and left.
"Rickey Hames stated that on August 16, 1970, the day of Lovett's disappearance, Appellant came to a service station and asked for directions to Freemont Street. *Page 131 
Hames showed Appellant a city map. Hames further stated that Freemont Street and the service station were in the same neighborhood.
"Prior testimony of James Howell Legg, who was deceased at the time of the murder trial, was also introduced. Legg stated that he was at his service station on August 16, 1970, and that he saw the Appellant there between 4-6 p.m. Legg never wavered in his certainty that it was Appellant he had seen that day.
"Several of the victim's neighbors were called to the witness stand. Mr. Sherlon Nagy was the next-door neighbor of the Lovetts and last saw him on August 16, 1970, at 8:30 p.m.
"Mrs. Betty Third stated that after she had gone to bed around 10:30 p.m. on August 16, 1970, she heard someone shout, `help, help, let me go' and there was a loud noise. Mrs. Third looked out the window and saw a Volkswagen moving slowly past the Lovett residence and a man walking around her house. On cross-examination Mrs. Third testified that she heard a loud noise which could have been a car backfiring. Mrs. Third was unfamiliar with guns.
"Mr. Henry David Hardiman heard a loud noise on August 16, 1970, sometime after 9:30 p.m. He woke up and looked out the window. Although he did not see anyone, he noticed that his barbecue grill had been knocked over. Mr. Hardiman did not know whether or not the loud noise he heard was a shotgun blast.
"Miss Debbie Garrett testified that on August 16, 1970, she lived on Freemont Street and her mother worked at a nearby convenience store. On the night in question Miss Garrett was with her mother at the store and at around 10:30 p.m. she went outside the store to lock up the ice machine. At this time Miss Garrett saw a woman driving a dark green Volkswagen with its headlights off. Miss Garrett got a magazine from the store and sat in her mother's car. During this time she watched the woman and saw her make two trips to Freemont Street. The second time the woman sat there a minute, then Miss Garrett heard a shout. The woman then drove down the back alley at a fast speed. The automobile was out of Miss Garrett's sight for around ten seconds, then she saw it again. This time the headlights were on and Miss Garrett saw two additional men in the car with the woman. One man was slumped down in the seat and the other had his back to Miss Garrett. Miss Garrett identified the driver of the automobile as Sue Dolvin, wife of the Appellant.
"The victim's wife then took the stand. She talked to her husband by telephone around 10:00 p.m. on August 16, 1970. That was the last she ever heard from the victim.
"After talking to her husband Mrs. Graves went outside the Dairy Queen to take out some trash. When she opened the door she saw a green Volkswagen parked almost directly in front of the door. A man was in the driver's seat and a woman was on the passenger side. The woman stared at her and was identified as Mrs. Sue Dolvin.
"Mrs. Graves further testified that the victim had never had any dental work but that he had a dark stain on his bottom teeth. To her knowledge he had a perfect set of teeth and had had no fillings or tooth extractions.
"Mr. Robert E. Hancock of the Alabama Department of Public Safety testified that in his investigation of the victim's disappearance he went to the Dolvins' residence in Key West, Florida. Outside he observed an old green Volkswagen with an application for replacement tag stuck to the rear window. A Florida search warrant was obtained and a brown paper bag and map were taken from the luggage compartment of Mrs. Dolvin's car. The items were sent off to the FBI laboratory in Washington, D.C.
"Mr. Alison Sims of the FBI stated that he tested the bag and map for blood stains. Although he was able to detect human blood stains on both items, the particular blood type could not be determined.
"Mr. Robert Quackenbos stated that he managed the trailer park where the Dolvins lived. In August, 1970, Quackenbos lived *Page 132 
next door to the Dolvins. Although his bedroom was located next to the road and he was being very watchful because of vandalism problems, at no time did he hear the Dolvins go in their trailer during the weekend of August 16, 1970. Moreover, the Volkswagen was gone the entire weekend. The Dolvins' daughter stayed at the Quackenbos' trailer during part of that weekend.
"Florida State Trooper Clarence Lee Simpson was on duty in Ocala, Florida, in the early morning hours of August 18, 1970. Around 1:00 a.m. Sue Dolvin came in the Highway Patrol Station and signed a lost tag form. Mrs. Dolvin had smudges on her and her fingernails and clothes were dirty. She appeared as if she had been camping in the woods.
"David Sandlin was the Sheriff of Morgan County in August, 1970. He drove to Key West, Florida, after Appellant waived extradition in order to return Appellant to Morgan County, Alabama. Sandlin noticed that Appellant had a black eye.
"John Cardi, a construction worker in Sanford, Florida, discovered some bones at a construction site in December, 1977. Police investigators were called to the scene.
"Chad Barton, an investigator with the Sanford, Florida, Sheriff's Department investigated the skeletal remains discovered by Cardi. A shotgun pellet and wadding were found in the remains; sixteen pellets believed to be lead in content were also removed from the chest cavity. "Barton personally flew the skeletal remains to Dr. Joseph H. Davis, the Chief Medical Examiner in Miami, Florida.
"Dr. Davis examined the remains and determined them to be those of a caucasian male in his mid-twenties at the time of death. It was Davis' opinion that the victim had not died of suicide or natural or accidental causes. Davis stated that he would classify the victim as a probable homicide as a result of a gunshot wound.
"The bones had been buried from 1-10 years.
"Dr. Richard Souviron, a forensic odontologist, assisted Dr. Davis in examining the teeth found along with the skeleton. Dr. Souviron determined that the teeth were those of a caucasian male between the ages of twenty-five and thirty-five. The teeth appeared to be perfect, with no cavities, fillings or apparent orthodontal work. Also noted was a dark stain along the gum line. Souviron stated that a set of perfect teeth was very rare.
"Souviron was given photographs of the victim and enlargements were made. Comparing the remains with the photograph Souviron found the formation and angle of the lower jaw to be consistent with the victim's. Souviron further found the upper jaw to be consistent with the victim's.
"In sum, based on fourteen points of comparison, Souviron found nothing inconsistent between the photographs and the remains of the victim and it was his opinion that the skeletal remains were indeed those of Charles Ray Lovett.
"From the foregoing summary of evidence put on by the State there can be no question but that sufficient evidence was produced to send the case to the jury. First, Appellant clearly had a motive for killing Lovett in order to prevent him from testifying against him on a criminal charge.
"Furthermore, before Lovett disappeared Appellant was seen glancing around Freemont Street with a piece of paper in his hand.
"More importantly, on the afternoon of Lovett's disappearance two eye witnesses placed Appellant at a service station a mile from Lovett's home and Appellant specifically asked one of the attendants for directions to Freemont Street.
"Moreover, the victim's wife pinned down Lovett's disappearance to between 10:00-11:00 p.m. on August 16, 1970. At around 10:30 p.m. Mrs. Betty Third, a neighbor, heard a voice crying, `Help, help, let me go', then heard a loud noise. When she looked out the window she saw an automobile of the same make as Appellant's wife's car moving slowly past the Lovett residence.
"Another neighbor, Henry David Hardiman, also heard a loud noise on the night in question around 10:30 p.m. Neither Mrs. *Page 133 
Third nor Hardiman knew if the loud noise was a gunshot.
"Further evidence against Appellant was provided by Miss Debbie Garrett, who on the night of the disappearance observed Appellant's wife driving around Freemont Street with no headlights on and then speeding back down there where a cry for help was heard. At this point Mrs. Dolvin took off in a hurry and when she passed by Miss Garrett, there were two other men in the car, one of whom was slumped over.
"Further evidence of the joint participation of the Dolvins was provided by the victim's wife, who observed Sue Dolvin and a man parked in front of the Dairy Queen where Mrs. Graves worked. Although Mrs. Dolvin stared at her, Mrs. Graves was unable to see the man's face clearly.
"Later items stained with human blood were found in the automobile owned by Mrs. Dolvin.
"When Appellant and his wife were later seen by law enforcement officials, Appellant had a black eye and Mrs. Dolvin looked as though she had gotten dirty in the woods."
In a homicide prosecution circumstantial evidence alone may be sufficient to prove the accused's commission of or participation in the killing. Eyewitness testimony is not required. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978); cert. denied, 368 So.2d 877 (Ala. 1979). The test of the sufficiency of circumstantial evidence is whether the circumstances as proved point to guilt and exclude any reasonable hypothesis except that of guilt. Cumbo, 368 So.2d at 875.
While motive is always a proper subject of proof, Carey v.State, 361 So.2d 1176 (Ala.Cr.App. 1978), proof of motive alone cannot support a conviction for murder, although its presence, along with other incriminating factors, may become particularly significant where the evidence is circumstantial.
The mere presence of a person at the time and place of a crime is not sufficient to justify his conviction for the commission of the crime. Kimmons, 343 So.2d 542 (Ala.Cr.App. 1977).
Here the State only proved that the defendant was in the victim's general neighborhood, that the defendant sought directions to the street on which the victim resided, and that the defendant had a possible motive for wanting to kill the victim. The defendant was never connected in any way with his wife and there was absolutely no evidence of any conspiracy between the defendant and his wife to kill the victim. The record discloses the clear and obvious absence of any circumstances from which the criminal agency of the defendant could be reasonably inferred and which would exclude any reasonable inference consistent with his innocence.
The issue of the insufficiency of the evidence was properly presented at trial and on motion for new trial. Our review of the evidence leaves no doubt that the defendant was convicted on speculation, suspicion, and conjecture. The judgment of conviction is therefore reversed. Under Burks v. United States,437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), the judgment must be rendered.
REVERSED AND RENDERED.
All Judges concur.