Charles Edward Payne and Raymond Andre Watts, both thirteen years old, were adjudged delinquent upon a juvenile petition charging the murder of Booker T. Williams. The juveniles were committed to the custody of the Alabama Department of Youth Services. This appeal is from that adjudication.
 I. PAYNE A
Payne's adjudication of delinquency is affirmed despite error in the admission of his extrajudicial statement.
Williams was murdered on February 9, 1985. Four days later, two Prichard police officers, investigating the murder, went to Dunbar Middle School to talk to Payne. Payne was called into the principal's office and read his Miranda rights. At no time was Payne informed that he had a right to communicate with his "counsel, parent, or guardian" and that reasonable means would be provided for him to do so, as required by Rule 11 (A)(4), A.R.J.P. Although there is conflicting evidence on this point, there was testimony that Payne's grandmother was present with Payne when he was given his Miranda rights. There was also testimony that "five to ten" minutes after the questioning began, Payne's mother arrived. She was only told why the officers were talking to her son.
After a hearing on the voluntariness of the statements, the trial judge "limited" the admission of statements "to statements made after the arrival of his mother, being his parent" because Payne had not been warned of his right to communicate with his counsel, parent or guardian as required by Rule 11, A.R.J.P.
Rule 11 (A)(4) provides that when a child is taken into custody he must be informed of his Miranda rights and in addition be told that "[i]f his counsel, parent, or guardian is not present, that he has a right to communicate with them, and that if necessary, reasonable means will be provided for him to do so." Ex parte Whisenant, 466 So.2d 1006, 1007 (Ala. 1985). If this warning is omitted, "the use in evidence of any statement given by the child is constitutionally proscribed." Id.
However, this right is conditional in that the child must be warned of it only in the absence of counsel, a parent, or a guardian. Rule 11 (A)(4), A.R.J.P., does not apply if one of these three people is present. Taylor v. State [Ms. 2 Div. 289 *Page 258 
February 12, 1986] (Ala.Cr.App. 1986). In effect, Rule 11 (D) requires the presence of counsel, a guardian, or a parent when a child is taken into custody and warned of his Miranda rights or, in the absence of counsel, parent, or guardian, it required that the child be informed of his right to communicate with them.
The first question we must decide is whether Payne's grandmother qualifies as a "guardian" under Rule 11 (A)(4). The Attorney General argues that "guardian" should be interpreted to include a "responsible person" as defined by Alabama Code 1975, § 26-15-2.
"Responsible person" is defined in the Alabama Child Abuse Act to mean "a child's natural parent, stepparent, adoptive parent, legal guardian, custodian or any other person who has the permanent or temporary care or custody or responsibility for the supervision of a child." § 26-15-2. By definition, every guardian is a responsible person. However, not every responsible person is a guardian. Rule 11 (A)(4) does not envision such a broad category of people as that included in the term "responsible person."
However, the term "guardian" in Rule 11 (A)(4) "is not limited to a person appointed in a legal proceeding, but includes as well a `de facto guardian' who establishes his status by acting in loco parentis." Hall v. State,264 Ind. 448, 346 N.E.2d 584, 586, n. 2 (1976) (minor's sister was a guardian where minor's natural father had divorced his mother when minor was two years old, mother had subsequently died and minor had thereafter lived with his sister prior to the incident in hand). See also Andrews v. State, 441 N.E.2d 194
(Ind. 1982) (minor's grandmother was a de facto guardian where the minor had run away from his adoptive parents, had spent most of his life with his grandmother, trusted his grandmother more than his parents, and considered her to be his guardian). Here, there was no showing that the grandmother was Payne's de facto guardian. There was not even any evidence that she was in any way, apart from her relationship, responsible for Payne's supervision. In fact, there is no evidence showing any relationship between Payne and his grandmother other than the testimony that she was his grandmother. Consequently, Payne's grandmother does not constitute a guardian within the meaning of Rule 11 (A)(4).
We must also determine what effect, if any, Payne's mother's presence had upon the admissibility of his statement. Mrs. Payne arrived some five to ten minutes after the officers began questioning her son. The officers continued to question her son after she had entered the principal's office. Police Officer Frank Dees testified that, when Mrs. Payne arrived, he told her "why we were talking" to her son. Payne was not given hisMiranda rights in his mother's presence and there is no evidence to indicate that Payne was actually offered or afforded the opportunity to talk with his mother or that he was informed of his right to communicate with her. The trial court admitted that portion of Payne's confession given after his mother was present, finding that her presence "cured" the defect: "Once she arrived, he had the opportunity to communicate with her. When she was present, he had that opportunity, and he could have spoken with her."
In that portion of Payne's statement which was admitted into evidence, Payne admitted hearing Karen "Karo" Steele state that she was going to kill Williams, admitted going with Karo and several others to Williams' apartment, and admitted being outside the residence when the murder occurred, but denied ever going into the apartment.
The admission of this statement was error because Payne was never advised that he had a right to communicate with his counsel, parent, or guardian. That particular warning "is a necessary procedural safeguard to protect a juvenile from innocently waiving his privilege against self-incrimination."Whisenant, 466 So.2d at 1011 (Torbert, C.J., concurring in part, dissenting in part). Without some showing that Payne had a recognition of his right to *Page 259 
communicate with his mother, it is difficult to establish that that particular right was knowingly, intelligently, and voluntarily relinquished and that his statement was made voluntarily. Id. at 1009.
Informing the child of his right to communicate with a parent or guardian serves two important purposes. First, "[t]his simple warning will give the juvenile the opportunity to obtain the guidance necessary in order for him to evaluate his rights." Ex parte Whisenant, 466 So.2d at 1012 (Torbert, C.J., concurring in pertinent part). Secondly, the rule recognizes that "the parent or guardian may be the conduit throught which the juvenile secures an attorney." Id.
Here, Payne was never informed of his right to communicate with a parent after he was taken into custody. When his mother entered the room, he was still unaware that he could stop the interrogation and consult with her. Thus, Payne was effectively precluded from obtaining parental guidance in the evaluation of his rights. By the same token, the mother was not aware of the child's right to communicate with her, nor was she present when the child's Miranda rights were explained. The officers only told her "why" they were talking to her child. Thus uninformed, the mother was not in a position to assist Payne in the evaluation of his rights or to seek an attorney on his behalf. We hold that the mere presence of a child's parent at some point in time after the custodial interrogation of the child has begun does not cure or render harmless the error occasioned by the failure of the police to inform the child when he was taken into custody that he had the right to communicate with his parent or guardian.
Our holding finds support in the policy reasons behind the adoption of additional safeguards for juveniles in the Rules of Juvenile Procedure.
 "`The concept of establishing different standards for a juvenile is an accepted legal principle since minors generally hold a subordinate and protected status in our legal system. There are legally and socially recognized differences between the presumed responsibility of adults and minors. Indeed the juvenile justice system . . . is substantially different in philosophy and procedure from the adult system. This State, like all the others, has recognized the fact that juveniles many times lack the capacity and responsibility to realize the full consequences of their actions. As a result of this recognition minors are unable to execute a binding contract, unable to convey real property, and unable to marry of their own free will. It would indeed be inconsistent and unjust to hold that one whom the State deems incapable of being able to marry, purchase alcoholic beverages, or even donate their own blood, should be compelled to stand on the same footing as an adult when asked to waive important . . . rights at a time most critical to him and in an atmosphere most foreign and unfamiliar.' (Citations omitted.)" Ex parte Whisenant, 466 So.2d at 1010-11 (Torbert, C.J., concurring in pertinent part), quoting Lewis v. State, 259 Ind. 431, 437, 288 N.E.2d 138, 141 (1972).
However, any error in the admission of Payne's statement constitutes only harmless error. Chapman v. California,386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The significant facts contained in Payne's statement were undisputed at trial. In closing argument, Payne's defense counsel admitted as much:
 "[T]hat's all we have when you boil down the testimony, that is all we have that Charles Payne was doing over there, was along for the ride. * * * He was there. We haven't denied that."
This case was tried before a judge sitting without a jury. All the essential elements and facts contained in Payne's statement were proven by other testimony and were virtually undisputed. Consequently, the error in the admission of his statement was harmless. Romine v. State, 384 So.2d 1185, 1188
(Ala.Cr.App.), cert. denied, Ex parte Romine, 384 So.2d 1188
(Ala. 1980); Kelley v. State, 366 So.2d 1145, 1150 (Ala.Cr.App. 1979). *Page 260 
 B
Payne also argues that the State failed to prove that he was involved in Williams' murder because the evidence merely shows that he was present at the scene.
Jamie Robinson testified that soon after midnight on the night of February 8, 1985, Geraldine Steele, Payne, and Watts came to his house. Watts had a shotgun and Geraldine asked "for some bullets," which Robinson did not give them.
Sixteen-year-old Kenneth O'Bair had recently pled guilty to manslaughter for his part in the Williams homicide. He testified that, on the Friday night of February 8, Payne, Watts, himself, Derrick "Knock Knock" Steele, and some others had been to a club called the Eclipse. They left about midnight and began walking home when Patricia Steele, Derrick's aunt, drove up and stopped. She told them to get in the car because they were "fixing to go over to Prichard, to shoot somebody up." Everyone got in except O'Bair, who did not go because there was not enough room in the car. Earlier, Payne had told O'Bair he was going to spend the night at Derrick's house.
The State's evidence shows that around ten or eleven on the morning of February the 9th, O'Bair went to Derrick's house. Payne and Watts and some others were present. Watts and the others were "outside on the porch." O'Bair testified that Derrick was "telling me about what happened last night, about Boochy [Lenova McCants] shooting at the man." O'Bair stated that Payne told him "about it, he [Payne] said they wouldn't let him go out there that night. He said he was gonna go today."
Inside the house a .22 caliber rifle and a .12 gauge shotgun were on a table. O'Bair testified that, while Payne was in "the front room," Karen "Karo" Steele was in "the back room" telling Watts and the others "what we had to do, what everybody was gonna do." Karo wanted to kill Williams and she "was planning everything, telling us what we had to do." O'Bair testified that Karo told Watts she wanted him to "follow her" and that she told Payne "to stay back." While she was talking, Watts put the shotgun "in his pants." Payne, Watts and the others then got into two cars and drove to Williams' apartment in Prichard.
At the scene, Watts still had the shotgun. While some members of this group went up to the house and entered, Payne and Watts went "around back." O'Bair did not see either Payne or Watts inside the house but he heard someone "kick in the back door." Later, O'Bair testified that he just saw Payne start to go around back. After the shooting, everyone ran. Watts and Payne ran "from the back and side" to get in a car.
Everyone went to Carrie Steele's (Derrick's mother) house and hid the guns in the attic. Everyone then went to Karo's grandmother's house where everybody except Payne was drinking. At this party, Watts told O'Bair that he shot the back door in after Lenova "Boochy" McCants told him to. That night, they went to the Eclipse Club, where the shotgun was taken away from Watts.
Terrance Lamar Koen was at Karo's grandmother's house. She testified that Payne told her "that they went over in Prichard to kill a dude . . . to kill a man." Payne did not tell her what he personally did. Koen admitted giving a statement to the police admitting her involvement in the murder. However, on the witness stand, she claimed that she was "scared" when she confessed and that none of the events of her statement happened, that she "made up" the statement and that she "didn't know what happened." In her statement, she claimed that Watts shot down the back door and was one of the eight people who shot Williams and also that, during this time, Payne was inside the house.
Richard Dale Carter, a forensic scientist, testified that the four shotgun shells found at the murder scene were fired from the particular shotgun found in Watts' possession. *Page 261 
When the State rested its case, both Payne and Watts requested judgments of acquittal. Both motions were denied. As to Payne, the trial judge commented:
 "THE COURT: Mr. Ashbee, I've studied my notes. I do find sufficient connection to deny your motion. If we still had the old aiding and abetting, it would fall into that category; we do not. He was at the scene. He was in the planning stages. He was in the car. He left with the same group. My notes indicate he was in the back yard, with one individual who had the shotgun, and that he then went to the party afterward. There is so much . . . so much evidence that ties him into the group that I cannot under the present statute the way it's drawn [separate ?] him from the action of the one who actually committed the murder. I must deny your motion."
As to Watts, the judge stated:
 "THE COURT: I have to deny your motion based upon the evidence I have heard. There is an even stronger case concerning Richard Watts. . . . Raymond Watts, in this Court, from the testimony I have heard, and I must deny your motion, and I do."
Since both defendants filed motions for a directed verdict of acquittal at the close of the State's evidence, in determining the sufficiency of the evidence, this Court can consider only that evidence which had already been presented when the motion to exclude was made. German v. State, 429 So.2d 1138, 1140
(Ala.Cr.App. 1982).
"The mere fact that a person witnesses a crime does not make him an accomplice." Nelson v. State, 405 So.2d 392, 397
(Ala.Cr.App. 1980), reversed on other grounds, 405 So.2d 401
(Ala. 1981). "The mere presence of a person at the time and place of a crime is not sufficient to justify his conviction for the commission of the crime." Dolvin v. State,391 So.2d 129, 133 (Ala.Cr.App. 1979), reversed, 391 So.2d 133 (Ala. 1980). However, "if presence at the time and place a crime is committed, in conjunction with other facts and circumstances, tends to connect the accused with the commission of the crime, then the jury may find the accused guilty." Dolvin, 391 So.2d at 137. "[P]resence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred." 22 C.J.S. Criminal Law § 88 (2)(d) (1961). Gibson v. State,49 Ala. App. 18, 20, 268 So.2d 49 (1972).
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense: * * * He aids or abets such other person to commit the offense." Alabama Code 1975, §13A-2-23 (2). "Any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether or not the one so contributing is present, brings the accused within the statute that makes any person concerned in the commission of a felony, directly or indirectly, a principal. No particular acts are necessary to make one an aider and abettor." Scott v. State, 374 So.2d 316,318-19 (Ala. 1979) (citations omitted). However, "mere consent to a crime, when no aid is given and no encouragement rendered, does not amount to participation." State v. Tally, 102 Ala. 25,68, 15 So. 722, 738 (1894).
 "[T]o be an aider or abettor when no assistance is given or word uttered, the person so charged must have been present by preconcert, special or general, or at least to the knowledge of the principal, with the intent to aid him. This view is very clearly stated by Mr. Wharton. He says: `It is not necessary, therefore, to prove that the party actually aided in the commission of the offense. If he watched for his companions in order to prevent surprise, or remained at a convenient distance in order to favor their escape, if necessary, or was in such a situation as to be able readily to come to their assistance, the knowledge of which was calculated to give additional confidence to his companions, in contemplation of law he was aiding and abetting.' 1 Whart.Cr.Law, § 210. And the same *Page 262 
idea is thus expressed by Mr. Stephens in his Summary of Criminal Law: `The aiding and abetting must involve some participation. Mere presence without participation will not suffice if no act whatever is done in concert, and no confidence intentionally imparted by such presence to the perpetrators.' See Connaughty v. State, 1 Wis. 159. And Mr. Bishop says: `A principal in the second degree is one who is present lending his countenance and encouragement, or otherwise aiding, while another does the act.' Bish.Cr.Law, 648. And Mr. Wharton further says: `Something must be shown in the conduct of the bystander which indicates [to the perpetrator, manifestly a design to encourage, incite, or in some manner afford aid or consent to the particular act, though when the bystander is a friend of the perpetrator, and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone will be regarded as an encouragement. * * * The confederacy must be real. * * * Mere consent to a crime, when no aid is given and no encouragement rendered, does not amount to participation.' 1 Whart.Cr.Law, §§ 211a, 211c, 211d." Tally, 102 Ala. at 68, 15 So. 722.
Although mere presence at the time and place of a crime is not sufficient to justify a conviction for the commission of that crime, presence is a factor to be considered by the jury in determining the guilt of the accused because "mere presence does establish a `material fact, which is the opportunity of defendant to commit the offense.'" German, 429 So.2d at 1141.
To make one accused of a crime an accomplice, "the State must adduce some legal evidence implying that he either recruited, helped or counseled in preparing the [crime] or took or undertook some part in its commission. Criminal agency in another's offense is not shown merely by an exhibition of passivity." Pugh v. State, 42 Ala. App. 499, 502, 169 So.2d 27
(1964).
Here, the State's evidence affords the reasonable inference that Payne was more than a passive observer. Payne was present when Geraldine Steele attempted to obtain some "bullets" for the shotgun Watts was carrying. He was present at Williams' residence with the knowledge that everyone had arrived there to kill Williams. There is evidence which affords a reasonable inference that Payne was present with Watts when Watts shot in the back door. Finally, Payne was present when the murder weapons were hidden and, later, at a celebration held after the killing. All these circumstances and the reasonable inferences to be drawn from them support the conclusion that Payne was an aider and abettor, that his presence was intended to encourage the murder, and that he was present to render assistance should it become necessary.
 II. WATTS A
The admission of Payne's statement was harmless to both Payne and Watts.
The only direct reference to Watts in the admitted portion of Payne's extrajudicial statement is the following:
"Q. [Officer Fail]: Who all was there?
 "A. [Payne]: Knock Knock, Karo, Bubba, me, his grandmother, Iris, Michael, Bull [Watts' nickname], Dwan, Pat, Lenova.
. . . .
"Q. What time did ya'll leave Knock Knock's house?
"A. I don't know. Twelve or one."
This statement apparently makes reference to the parties' presence at "Knock Knock's" house an hour or two before the crime was committed. Other evidence clearly establishes that Watts was present at "Knock Knock's" house while the crime was being planned and that he was also present when the victim was murdered. Indeed, in closing arguments, Watts' attorney commented, "I submit to the Court that while Raymond Watts may be guilty of something, he is not guilty of murder. That he was there [at the scene]. We cannot deny that. . . ." *Page 263 
We fail to see how the introduction of Payne's statement was prejudicial to Watts.
 B
Watts also contends that the trial court committed reversible error when it ruled that Dwan Burden, a mentally impaired 15-year-old youth, was competent to testify at the adjudication hearing.
Section 12-21-165, Code of Alabama 1975, provides that:
 "(a) Persons who have not the use of reason, such as idiots, lunatics during lunacy and children who do not understand the nature of an oath, are incompetent witnesses.
 "(b) The court must, by examination, decide upon the capacity of one alleged to be incompetent."
On voir dire examination, Burden stated that he knew the difference between the truth and a lie and that "God would punish" him if he told a lie in court although he did not know "how" God would punish him.
The trial court permitted Burden to testify after instructing the child on the law of perjury:
 "THE COURT: I have a parade of people in the Court, all the time, with low I.Q.'s, younger age than he is, and it's really difficult when you get a child under the age of five, for them to explain the understanding of what truth and lies are, and I think he's given a reasonable explanation of that. I think, though, that I am required to give him some instruction at this point. Dwan Burden, I am instructing you in this way, and I want you to listen carefully. There is such a thing in law called perjury. And perjury is the giving of testimony that is false, once one has taken an oath in Court to tell the truth, nothing but the truth, the whole truth. If one, having sworn and taken an oath, that they will tell the truth before a Court, then intentionally misrepresents the facts by telling a lie, to any question asked in the Court, he can be found guilty of the crime of perjury, and for that offense as an adult could be imprisoned, or as a juvenile could also be detained, the equivalence of being imprisoned. So, I instruct you that is the penalty for the offense of perjury. You are expected to tell the truth at all times to all questions that are asked you. I have concluded, though, he is competent to testify as a witness before the Court."
Larry Faison, a psychological examiner for the Mobile County Youth Center, testified that he had conducted a psychological evaluation of Dwan Burden and determined that the child had a full scale I.Q. within the "range of mild mental retardation." Faison stated that the child "would attempt to deny responsibility for most actions," and that "there is a lot of confusion in his thinking." However, Faison also noted that Burden had an adjusted mental age of 9.5, and thus "would function socially, intellectually, and in most ways about a nine to ten year old at best."
 "A person is disqualified to be a witness if, by reason of mental derangement, he lacked the capacity to observe the matter to be testified about, if he now lacks capacity to narrate such matter or if he does not understand that it is his moral duty to tell the truth."
. . . .
 "Whether a person's affliction with a mental defect is such as to incapacitate him to be a witness is a matter to be determined by the trial judge . . . [A] trial judge's ruling on this question stands on appeal unless there is strong evidence of an abuse of discretion."
C. Gamble, McElroy's Alabama Evidence, § 94.01 (2) (3d ed. 1977); Smith v. State, 380 So.2d 345, 347 (Ala.Cr.App. 1980).
 "In each particular case where the competency of a witness is challenged the fundamental question is whether `the derangement or defect is such as to make the person highly untrustworthy as a witness.' 2 Wigmore, Evidence § 492 at p. 698 (Chadbourn rev. 1979). It is generally accepted that `the derangement or defect, in order to disqualify, must be *Page 264 
such as substantially negatives trustworthiness upon the specific subject of the testimony.' 2 Wigmore, § 492 at 699. In order `to exclude a witness on the ground of mental or moral incapacity, the existence of the incapacity must be made to appear'. 2 Wigmore, § 497 at 703, citing Puckett v. State, 213 Ala. 383, 105 So. 211 (1925); Conner v. State, 52 Ala. App. 82, 86, 289 So.2d 650, cert. denied, 292 Ala. 716, 289 So.2d 656 (1974). `A presumption of competency attends a witness.' Hutcherson v. State, 40 Ala. App. 77, 79, 108 So.2d 177, 178 (1958). The burden of proving the incompetency of a witness is upon the party objecting. Birmingham Ry., Light Power Co. v. Jung, 161 Ala. 461, 49 So. 434 (1909). `The discretion of a trial judge as to the competency of a witness is of a well nigh irrevisable nature.' Trammell v. State, 53 Ala. App. 246, 247, 298 So.2d 666, 667 (1974)." Smith v. State, 380 So.2d at 347-48.
We find no abuse in the trial court's ruling that Burden was competent to be a witness. Any particular defects in his testimony or his capacity to observe and remember events bear on his credibility as a witness and not on his competency. SeeSmith v. State, 380 So.2d at 348.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.