[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 147 
In March 1996, the Limestone County grand jury returned a four-count indictment against the appellant, Christopher G. Harris. Count I of the indictment charged Harris with murder made capital because it was committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala. Code 1975; Count II of the indictment charged Harris with robbery in the first degree, see § 13A-8-41(a)(2), Ala. Code 1975; Count III of the indictment charged Harris with burglary in the first degree, see § 13A-7-5(a)(2), Ala. Code 1975; and Count IV of the indictment charged Harris with theft of property in the first degree, see § 13A-8-3(b), Ala. Code 1975. A jury found Harris guilty of the lesser-included offense of felony murder[1] as to Count I of the indictment, guilty of robbery in the first degree as charged in Count II of the indictment, guilty of burglary in the first degree as charged in *Page 148 
Count III of the indictment, and not guilty of theft of property in the first degree as to Count IV of the indictment. The trial court sentenced Harris to life imprisonment for each of his convictions, the sentences to run consecutively.
 I.
On appeal, Harris contends that the trial court erred in denying his motions for a judgment of acquittal, made at the close of the State's case and at the close of all the evidence, because, he says, the evidence was insufficient to sustain his convictions. Specifically, Harris argues that the State proved that he was present at the time of the crimes, but that his presence alone was not sufficient to establish his liability as an accomplice.
The evidence adduced at trial indicated the following. On February 21, 1996, at approximately 9:00 a.m., Angela Anderson dropped off her two-year-old daughter at the home of her mother, Barbara Ann Wilson, so that she could visit a friend in the hospital. Later that day, Anderson telephoned her mother, but there was no answer. When she drove by her mother's home, she said, her mother's car was not in the driveway, and she assumed that her mother had taken her daughter with her to visit a relative in Nashville, Tennessee. The following morning, Anderson again went to her mother's home, hoping to find a note from her mother. When she arrived, her daughter came outside and greeted her. Anderson saw that the side door to the home was open and she went inside where she noticed that her mother's purse was open and its contents were strewn across the floor. Anderson's daughter then told her that Wilson was asleep and led Anderson to a guest bedroom where she found her mother's body. Anderson then telephoned emergency 911.
Wilson's body was lying on the bed in the guest bedroom of the home; Wilson was naked and had been gagged with a sock. Marks on her arms indicated that she had been bound, and the cord from the kitchen telephone was found underneath her body. Wilson also had three cuts on her left hand. A knife was found on a shelf on the headboard of the bed where Wilson's body was discovered; a bloodstain was found on the kitchen floor; the home appeared to have been ransacked; and a television set, jewelry, and Wilson's 1993 Cadillac automobile were missing from the premises. The autopsy report, which was introduced into evidence by agreement of the parties in lieu of testimony from the coroner, indicated that Wilson had died from smothering and that the manner of death was homicide.
Wilson's Cadillac was later discovered in Kentucky and the State presented evidence indicating that Harris's codefendant, Daryl Turner, had pawned Wilson's television set at Bradford's Jewelry and Pawn on the afternoon of February 21, 1996. Testimony indicated that Turner had worked at the same construction company where Wilson's live-in boyfriend, L.T. Southard, worked. Before Harris's trial, Turner was convicted of capital murder, rape, robbery, burglary, and theft in connection with the death of Wilson.
Tavares McCurley, Harris's cousin and roommate, testified that on the morning of February 21, 1996, Turner came over to the house he and Harris shared. He testified that he was asleep on the couch when Turner arrived and that Turner woke him up and told him that "he had a lick." (R. 208.) McCurley stated that he understood a "lick" to mean "when you're about to go steal." (R. 209.) Turner asked McCurley to go with him, but McCurley refused. McCurley stated that Turner then went into the bedroom where Harris was asleep *Page 149 
and that he heard Turner ask Harris to go with him to do the "lick." McCurley then heard Harris say "Man, you've lost your damn mind." (R. 210.) McCurley testified that Harris then came out of the bedroom and told him that he was going to get some cigarettes; McCurley said that Harris and Turner left the house at the same time. According to McCurley, Turner returned to the house later that morning, asked where Harris was, and then said "Man, your cousin's a bitch. He ran." (R. 213.) When Turner returned, McCurley said, he was driving Wilson's Cadillac and he told McCurley that he had killed Wilson. He also asked McCurley for his identification so that he could pawn a television set. McCurley refused to give Turner his identification and Turner then left. About 30 minutes later, McCurley said, Harris returned to the house. Harris initially said nothing about the crime; however, sometime later, he told McCurley what had happened. McCurley testified:
 "Well, [Harris] told me what happened, that he had ran. He told me what [Turner] had done to the lady, and he said when he saw what was going on, he left. He said he was in the yard at first and [Turner] called him in the house. Once he seen what was going on, he said the little girl was in the room and he grabbed the little baby and took her to the other room and he ran."
(R. 217.)
Dennis Wooten, a major with the Huntsville Police Department, testified that he interviewed Harris on February 26, 1996, regarding Wilson's murder. Maj. Wooten stated that he read Harris his juvenile Miranda[2]
rights (Harris was 16 years old at the time of the crime); that Harris indicated that he understood those rights; and that Harris then gave a statement regarding Wilson's murder. Maj. Wooten testified that Harris initially said that he did not know anything about Wilson's murder and that he had nothing to do with Wilson's murder. However, Harris later changed his story and admitted that he was at Wilson's house, but he maintained that he was in the front yard when the murder occurred. As the interview continued, Maj. Wooten said, Harris eventually admitted that he was in the house at the time of Wilson's murder. Maj. Wooten testified as follows about Harris's statement:
 "He said that earlier he was at home, or at his house where he stayed, and that D, they had called him, Daryl Turner, came back to his house and said he was going to do a lick. And as we talked about what a lick was and basically he was going to commit a crime; rob someone.
 "He said that [Turner] had left the house and he remained there, and a few minutes later, something in the range of probably 20 or 30 minutes later, he decided to walk up to the store. And when he walked up to the store [to] buy some cigarettes for him and another person, he saw [Turner] on the phone, and [Turner] was talking to allegedly or apparently the victim on the phone, and that he overheard some of his conversation about coming up there, that he wanted to talk to her and get, pick something up or I think he might have dropped something off.
 "He went into the store, he bought the cigarettes and came back out and when he came back out, he saw Daryl Turner near the yard or in the yard of the victim's house. *Page 150 
 "When he did that, he then proceeded up there and when he got in the yard, [Turner] was already inside. He goes inside of the house and he sees Ms. Wilson laid out on the floor without a shirt on, and [Turner] had her with a knife to her throat.
 "And he said — he mentioned that there was another person in the house that was assisting on this thing in another part of the house saying that he was getting something or that he was taking something. He then said that he observed [Turner] take the lady, made her get up, kept with the knife to her throat and took her back to the bedroom.
 "There was also a small child in the house from my understanding from what [Harris] said. And that he was concerned about the child being there.
 "He said he walked to the doorway and he saw the other person in the house going through some drawers, and he then saw [Turner] get on top of the lady and start having sex with her at knife point.
 "He then said that after [Turner] finished having sex with her that he started, he took a pillow and started smothering her. And as [Turner] was smothering her, the other person, I think his name was [T.R.], allegedly came over and held her hands down while [Turner] had sex with her, actually murdered, killed her, smothered her to death.
 "He said that during the time, the little girl was apparently crying. He took the little girl from the room, put her into another bedroom somewhere in this time frame and came back to the doorway and watched a little more of this. And then he said he went into the kitchen to look for a phone because he was going to call the police and he said he found a phone but the cord was missing from the phone and so then he returned. Then, by the time he got back, they had apparently smothered the lady and she was dead.
". . . .
 "He said after this that apparently Daryl Turner took the lady's Cadillac and he left, and I'm not sure. It's been over four years ago, but I believe he said basically he left on foot from the house from there and [Turner] had taken the Cadillac."
(R. 244-47.)
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'"Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App. 1998), quotingFaircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd,471 So.2d 493 (Ala. 1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunnv. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O'Neal v.State, 602 So.2d 462, 464 (Ala.Crim.App. 1992). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and in such a case, this court will not disturb the trial court's decision.'" Farriorv. State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v.State, 557 So.2d 848, 850 (Ala.Crim.App. 1990). "The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue *Page 151 
for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040, 1042
(Ala. 1978).
Section 13A-2-23(2), Ala. Code 1975, provides that "[a] person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense . . . [h]e aids or abets such other person in committing the offense." "[I]n Alabama, an individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the princip[al] wrongdoer." Price v. State, 725 So.2d 1003, 1055
(Ala.Crim.App. 1997), aff'd, 725 So.2d 1063 (Ala. 1998). "The words `aid and abet' encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary." Henry v. State, 555 So.2d 768, 769 (Ala.Crim.App. 1989). "The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence." Miller v. State,405 So.2d 41, 46 (Ala.Crim.App. 1981) (citation omitted). "The jury is to determine whether the appellant's participation exists and the extent of it from the conduct of the parties and all the testimony presented."Walls v. State, 378 So.2d 1186, 1191 (Ala.Crim.App. 1979). "Such facts as the defendant's presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participation may be inferred." Sanders v.State, 423 So.2d 348, 351 (Ala.Crim.App. 1982). However,
 "`[t]he mere fact that a person witnesses a crime does not make him an accomplice.' Nelson v. State, 405 So.2d 392, 397 (Ala.Cr.App. 1980), reversed on other grounds, 405 So.2d 401 (Ala. 1981). `The mere presence of a person at the time and place of a crime is not sufficient to justify his conviction for the commission of the crime.' Dolvin v. State, 391 So.2d 129, 133 (Ala.Cr.App. 1979), reversed, 391 So.2d 133 (Ala. 1980). However, `if presence at the time and place a crime is committed, in conjunction with other facts and circumstances, tends to connect the accused with the commission of the crime, then the jury may find the accused guilty.' Dolvin, 391 So.2d at 137. '[P]resence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred.' 22 C.J.S. Criminal Law § 88(2)(d) (1961). Gibson v. State, 49 Ala. App. 18, 20, 268 So.2d 49 (1972).
 ". . . `Any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether or not the one so contributing is present, brings the accused within the statute that makes any person concerned in the commission of a felony, directly or indirectly, a principal. No particular acts are necessary to make one an aider or abettor.' Scott v. State, 374 So.2d 316, 318-19 (Ala. 1979) (citations omitted). However, `mere consent to a crime, when no aid is given and no encouragement rendered, does not amount to participation.' State v. Tally, 102 Ala. 25, 68, 15 So. 722, 738 (1894).
". . . .
 "Although mere presence at the time and place of a crime is not sufficient to justify a conviction for the commission of that crime, presence is a factor to be considered by the jury in determining the guilt of the accused because `mere presence does establish a "material fact, which is the opportunity of defendant to *Page 152 
commit the offense."' German [v. State], 429 So.2d [1138,] 1141 [(Ala.Crim.App. 1982)].
 "To make one accused of a crime an accomplice, `the State must adduce some legal evidence implying that he either recruited, helped or counseled in preparing the [crime] or took or undertook some part in its commission. Criminal agency in another's offense is not shown merely by an exhibition of passivity.' Pugh v. State, 42 Ala. App. 499, 502, 169 So.2d 27
(1964)."
Payne v. State, 487 So.2d 256, 261-62 (Ala.Crim.App. 1986). See also Webbv. State, 696 So.2d 295 (Ala.Crim.App. 1996).
Here, the evidence was sufficient to establish Harris's role as an accomplice in the robbery, burglary, and murder. The evidence showed that Harris followed Turner into Wilson's home, knowing that Turner was planning to rob someone that day; that Harris was present when Turner held a knife to Wilson's throat, raped her, and then smothered her; that Harris took Wilson's granddaughter out of the room where Turner was murdering Wilson, but came back to continue watching the murder; and that Harris and Turner left Wilson's house at the same time, Turner driving away in Wilson's automobile and Harris walking back home. In addition, although Harris claimed that, at one point, he had attempted to telephone the police only to discover the telephone cord was missing, it was undisputed that Harris did nothing to prevent Turner from murdering and robbing Wilson. The jury could have reasonably concluded from Harris's actions before, during, and after the crimes that Harris was present to render aid to Turner if it became necessary. Therefore, the trial court did not err in denying Harris's motions for a judgment of acquittal.
 II.
As noted above, Harris was convicted of felony murder during a robbery, robbery in the first degree, and burglary in the first degree. However, Harris could not constitutionally be convicted of both felony murder during a robbery and robbery in the first degree based upon the same conduct. Because the same robbery formed the basis for the felony-murder conviction and for the robbery conviction, Harris's convictions for both violated the principles of double jeopardy. SeeHarris v. Oklahoma, 433 U.S. 682 (1977); Peterson v. State, 842 So.2d 734
(Ala.Crim.App. 2001) (opinion on return to remand); Dorsey v. State, [Ms. CR-97-1522, May 25, 2001] ___ So.2d ___ (Ala.Crim.App. 2001); andWeaver v. State, 763 So.2d 972 (Ala.Crim.App. 1998), rev'd on other grounds, 763 So.2d 982 (Ala. 1999). Moreover, although Harris did not raise this issue in the trial court, nor does he raise it on appeal, "[t]he double jeopardy transgression in this case implicates the trial court's jurisdiction to render a judgment." Borden v. State, 711 So.2d 498,503 (Ala.Crim.App. 1997), aff'd, 711 So.2d 506 (Ala. 1998), citingRolling v. State, 673 So.2d 812 (Ala.Crim.App. 1995). See also Graysonv. State, 824 So.2d 804 (Ala.Crim.App. 1999), aff'd, 824 So.2d 844 (Ala. 2001), and Loggins v. State, 771 So.2d 1070 (Ala.Crim.App. 1999), aff'd,771 So.2d 1093 (Ala. 2000). The trial court lacked jurisdiction to adjudge Harris guilty of robbery in the first degree after he had already been adjudged guilty of felony murder based on that same robbery. Therefore, this case must be remanded for the trial court to vacate Harris's conviction and sentence for robbery.
Based on the foregoing, Harris's conviction and sentence for felony murder under Count I of the indictment and his conviction and sentence for burglary in the first *Page 153 
degree under Count III of the indictment are affirmed. However, this case is remanded to the trial court with directions to vacate its judgment as to Harris's conviction and sentence for robbery in the first degree under Count II of the indictment.
AFFIRMED AS TO CONVICTIONS AND SENTENCES UNDER COUNTS I AND III; AND REMANDED WITH DIRECTIONS.*
McMillan, P.J., and Cobb, Baschab, and Wise, JJ., concur.
[1] The trial court instructed the jury on both felony murder and intentional murder as lesser-included offenses of the capital-murder charge. The verdict form, however, did not distinguish between felony murder and intentional murder; it included only three options: guilty of capital murder, "guilty of the lesser included offense of murder," and not guilty. (C. 30.) The jury returned a verdict finding Harris "guilty of the lesser included offense of murder" without specifically indicating whether it found Harris guilty of felony murder or intentional murder. In addition, the trial court adjudged Harris "guilty of the lesser included offense of murder" without indicating whether it was adjudging Harris guilty of felony murder or intentional murder. Both Harris and the State proceed on appeal on the assumption that Harris was found guilty of felony murder during a robbery. The only difference between murder made capital because it occurred during a robbery and felony murder during a robbery is the accused's intent — capital murder involves an intentional killing while felony murder involves an unintentional killing. Given that the jury also found Harris guilty of robbery in the first degree under Count II of the indictment, the jury must have acquitted Harris of the capital-murder charge because it found that Harris did not intend to kill Barbara Ann Wilson, not because it found that Harris did not commit the robbery. Therefore, we conclude that Harris was convicted of felony murder during a robbery.
[2] See Miranda v. Arizona, 384 U.S. 436 (1966), and Rule 11, Ala.R.Juv.P.
* Note from the reporter of decisions: On January 7, 2003, on return to remand, the Court of Criminal Appeals affirmed, without opinion.