545 So.2d 240 (1989)
L.J.V., a juvenile
v.
STATE.
8 Div. 38.
Court of Criminal Appeals of Alabama.
February 24, 1989.
Rehearing Denied March 31, 1989.
Certiorari Denied May 19, 1989.
*241 Larry W. Madison of Groover, Thompson, Madison & Gray, Hartselle, for appellant.
Don Siegelman, Atty. Gen., and James B. Prude, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 88-893.
TYSON, Judge.
On August 7, 1987, L.J.V.'s sister and stepmother were shot in the head while they were asleep in their beds. The appellant's sister died as a result of her wound and his stepmother was seriously injured. Delinquency petitions were filed charging L.J.V., a 13-year-old, with what would constitute murder and attempted murder if he stood trial as an adult.
L.J.V. was found guilty of both offenses and he was adjudged to be a delinquent. He was committed to the Department of Youth Services.

I
The only issue raised on appeal is whether L.J.V.'s confession should have been excluded from evidence because it was obtained after L.J.V. had requested permission to speak to his father and was not afforded the opportunity to do so before he made the statement at issue.
The following portions of the transcript are relevant to the issue raised on appeal.
"VOIR DIRE EXAMINATION [of Officer Ed Taylor]
"BY MR. MADISON:

"Q Ed, I don't believe that exhibit you've got there has been introduced into evidence. Does it state something in there to the effect that the child has a right to communicate with his parents and that if he requests to do so, reasonable means will be provided for that purpose?
"A That's correct.
"Q And, he was advised of that right?
"A Yes, sir.
"Q At some point during the evening during your presence, did the child not ask you that he would like to speak with his father?
"A Yes, he did.

"Q And, was your response was that he'll find out when you tell us?
"A No, sir.
"Q Did Captain Collier, in your presence, make that statement?
"A No, sir.
"Q Was the father brought in to the child or a reasonable means of communication provided to the child to talk to his father?
"A The father was not brought in. He wasI really don't know how to answer can I explain that, my answer?
"Q Yes, the best you can.
"A He askedhe said he would like to speak to his father and I told him he could do that if he really wanted to, if he was sure that was what he wanted to do. I asked him wouldn't he really rather talk to us about it first, and he indicated that he would, at that time.
*242 "Q You talked him out of that?
"A That's what was said. I
"Q You said, `Wouldn't you really rather talk to us first?' is that what you told him?
"A We asked him would he not rather explain it first and he saidand, when I say, `we,' I really don't recall if it was Captain Collier speaking or myself, but he stated that he did want to talk to us.
"Q How long did y'all have him in the room isolated from the outside before he made that statement?
"A Probably an hour, at least.
"Q How long did this whole interview take, do you recall?
"A Before he began
"Q Well, how long did the entirefrom the time you first talked to him until the time you wrapped it up, how long did that take, let's approach it that way first.
"A Probably four or four and a half hours.
"Q Sometime during that time, your best judgment is now after about an hour, he asked to speak to his father?
"A It may have beenyes, approximately. It could have been about fifteen minutes either way on that, but somewhere around there.
"Q But, you asked wouldn't he rather talk to you first?
"A What we asked him was, if you want to speak to your father, then you can. Don't you want to tell us what happened?
"Q And, what was hiswithout going into telling you what happened, or anything, was his response to that negative or positive?
"A Positive.
"Q Was that in response to your first question to that effect? In other words, he said, "I want to see my father.' You said, `If you want to see your father.' you can, but wouldn't you rather tell us what happened first?' And he said, `Yes, I would.'
"A That's correct.
"Q In other words, he didn't say two or three times, `I want to talk to my dad.' Or, did you saywas that his very first response was, `Yes, I will be glad to talk to you instead.'
"A Yes. That's not specifically what he said, but I don't recall the exact words.
"Q What led up to him asking to speak to his father? What was being said when he said, `I think I'd like [to] talk to my father.'
"A We asked him if he had killed his sister.

"Q And that's when he said, `I want to talk to my father.' And you said, again, `You can if you want to, but wouldn't you just rather tell us what you done first?"
"....
"[Voir dire examination of Officer Kenneth Collier]
"Q Captain Collier, youat any time during your presence with L.J.V., did he ask to speak to his father, or communicate with his father?
"A Yes, sir.

"Q What was your response?

"A I told him his father was present. He was down the hall, and asked him if he wanted to speak with him right now or do you want to try to get the truth, get to the truth, and get it settled prior to talking to him. And, he wouldhe indicated verbally that he didn't want to speak to him right at that time, but wanted to try to get to him and try to get the matter straight.
"Q Ken, how many times did you tell L.J.V. that he did this before this conversation took place?
"A I'm sorry, would you
"Q Didn't you tell L.J.V. repeatedly, `You did it, you know you did it, you may as well tell us.'
"A Yes, sir.
"Q How many times before he made a request to see his father did you do that? A hundred times?
"A No, sir; no, no, nowhere near that many. Moreseveral times, and not in *243 exactly the context that you phrased it, no. Thewe indicated to him that a witness had seen him, that we knew that he had done committed a crime. And
"Q Did you go outside when he told you, `I want to talk to my father.' Was your reaction, to say, `Wouldn't you rather talk to us first?' Or, did you go outside immediately and say, `Your son would like to see you.'
"A I didn't go outside and say anything.
"Q In fact, you told L.J.V., wouldn't you rather tell us the truth first, basically?
"A In effect, yes, sir.

"Q You felt like he would talk more freely with you if his father wasn't present?
"A Yes, sir.

"MR. MADISON: That's all." (R. 305-06)
"CROSS-EXAMINATION [of Collier]
"BY MR. MADISON:

"Q Mr. Collier, again, when he said he wanted to see his father did you go out and inform his father that the child wanted to talk to him?
"A No, sir, I didn't.

"Q And, his father was not made available to him? Whether it was by his decision or whose, when he said, `I want to see my father,' his father was not made available to him thereafter until a confession or statement of some nature was taken.
"A I don't think I would word it that way, no, sir.
"Q Did he see his father?

"A Not at that time, no, sir.

"MR. MADISON: That's all.
"REDIRECT EXAMINATION BY MR. BURRELL:

"Q Well, did he indicate to you that he didn't want to see his father at that time after you asked him?
"A No." (R. 314-15)
"....
[Direct Examination of L.J.V.]
"Q L.J.V., do you remember when you made the statement to the police, just a verbal statement, and the written statement and drew all these sketches and so forth down at the police station?
"A Yes, sir.
"Q Prior to you doing that, did the police officers talk with you, Captain Collier and Lieutenant Taylor, did they talk with you some before you made those statements?
"A Yes, sir.
"Q What kind of things did they say to you before you made those statements?
"A Sir,Lieutenant Taylor was telling me, you know, asked me how old I was and how was I doing and what was my name and then he started saying thathe said, `You done it, and you know you done it, so why don't you tell me?' I said, `No, I didn't do it.' He just kept on, and I kept on saying, `No.' And then he said, `I'll be back in a minute.'
"And, so, he went and got Captain Collier. He came in and he started out nice, you know, he started with hobbies and stuff. And, then, he started saying, `Well, L.J.V., we think you done it.' And, I said, `Well, I didn't.' And he said, `Yeah, you did. Why don't you just tell you did.' And I said, `No, I want to see my father.' He said, `No.' He said, "No, you're not going to see your father until you tell us the truth and then you can tell him.'
"Q All right, did you take that to be denying you the ability to see your father?
"A Yes.
"Q What did you decide to do then?
"A I justthey kept on telling me that I done it, and I kept on telling them, `No.'
"Q Did you finally break down and tell them that you did do it, L.J.V.
"A Yes.
"Q During this time, though, did they ever tell you thatI understand they advised you previously, but did they tell you thatwell, let me just back up and ask you this: Did you hear Captain Collier testify *244 that he said, `Do you want to see him now or later,' or something to that effect?
"A No, I don't recall hearing that from him.
"Q Did you ask to see your father?
"A Yes.
"Q And, were you made to understand that you were not going to be able to?
"A Yes.
"Q Is that why you decided to go ahead and make any kind of further statements to him?
"A Yes, yes, sir." (R. 373-75) (Emphasis added.)
Rule 11(A), A.R.J.P. provides that:
"`(A) When the child is taken into custody, he must be informed of the following rights by the person taking him into custody:
"`(1) that he has the right to counsel;
"`(2) that if he is unable to pay a lawyer and if his parents or guardian have not provided a lawyer, one can be provided at no charge;
"`(3) that he is not required to say anything and that anything he says may be used against him; and
"`(4) if his counsel, parent, or guardian is not present, that he has a right to communicate with them, and that, if necessary, reasonable means will be provided for him to do so.'
"Rule 11(A)(1), (2), and (3), taken together are substantially the same as the warnings required in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). By virtue of Rule 11(A)(4), this Court included an additional warning for the protection of juveniles. Given the applicability of the exclusionary rule to the first three warnings mandated by Miranda, the threshold question, then, is whether the exclusionary rule is equally applicable to the fourth requisite. We think this question is self-answering. The very inclusion of this fourth requisite in Rule 11(A), as an additional right to be accorded children within the protection of that rule, precludes any rational basis for distinguishing the treatment of this fourth warning from that accorded the first three.
"... In reality, each of the four requisites stands on the same footing. To omit the fourth warning is as fatal as to omit of any one of the first three."
Ex parte Whisenant, 466 So.2d 1006 (Ala. 1985).
The evidence in this case establishes that L.J.V. was informed of the rights set out in Rule 11(A) including his right to communicate with a parent. There is no doubt from the record that the police officers did not afford L.J.V. a reasonable opportunity to see his father.
In Smith v. State, 484 So.2d 560 (Ala.Cr. App.1986), two juvenile boys were brought in for questioning concerning a burglary. The boys were told that they had a right to talk with an attorney and their mother and the boys requested to see their mother. When the mother arrived at the station, the police officer talked to the boys' mother outside the boys' presence. The mother told the police officers that, "She just wanted the truth and they [the boys] may talk to me [the officer] if she wasn't present, more freely." Smith, 484 So.2d at 561. The officer then interrogated the boys and they made a statement.
In determining that Rule 11(A)(4) "was not complied with to any extent whatever," this court stated:
"Even though the testimony was that the mother chose not to talk to the juveniles, the investigator was not free to interrogate the youths, for they had invoked their right to talk to her. Analogously, if an adult had requested to see his lawyer, but the lawyer said he did not wish to speak to his client and for the police to commence interrogation, the officers could not constitutionally do so. One person cannot waive another's constitutional rights. This rule is highlighted by the officer's testimony in this case that the juveniles had exercised this right by specifically asking to communicate with the parent."
Smith, 484 So.2d at 561.
"Informing the child of his right to communicate with a parent or guardian *245 serves two important purposes. First, `[t]his simple warning will give the juvenile the opportunity to obtain the guidance necessary in order for him to evaluate his rights.' Ex parte Whisenant, 466 So.2d at 1012. (Torbert, C.J., concurring in pertinent part). Secondly, the rule recognizes that `the parent or guardian may be the conduit throught which the juvenile secures an attorney.' Id."
Payne v. State, 487 So.2d 256, 259 (Ala.Cr. App.1986).
Although L.J.V. was informed of his right to communicate with his parent, he was not given the opportunity to exercise that right at the point when he first requested to see his father. He was not given the opportunity to talk to his father upon his request to obtain guidance in evaluating his rights or in securing an attorney.
Rule 11(A)(4), which gives a juvenile a right to communicate with his parents upon request would be meaningless if the juvenile is not allowed to exercise that right. Thus, the spirit of Rule 11(A)(4) was violated by the officers' failure to allow L.J.V. to communicate with his father.
When L.J.V. requested to see his father, he invoked his right to communicate with his father. The interrogation of L.J.V. should have ceased at this point and L.J.V. should have been allowed to communicate with his father, who was just down the hall, before any further interrogation.
It could be argued that, when the officers were questioning L.J.V., i.e. whether he wanted to see his father then or later, they were attempting to clarify an equivocal request by L.J.V. to see his father.
While police officers are allowed to clarify an equivocal invocation of a right, L.J. V.'s request was unequivocal. He asked to see his father and he should have been afforded the opportunity to do so at that point. Analogously to the right to see counsel, if a juvenile indicates, in any manner, that he wishes to talk to a parent, the interrogation must immediately cease. See Smith.
The State argues that, since L.J.V. was allowed to talk to his father after he made an oral statement but before he made a written statement, he was afforded an opportunity to communicate with his father.
"[T]he mere presence of a child's parent at some point in time after the custodial interrogation of the child has begun does not cure or render harmless the error occasioned by the failure of the police to inform the child when he was taken into custody that he had the right to communicate with his parent or guardian." 
Payne, 487 So.2d at 259.
Likewise, affording L.J.V. the opportunity to consult with his father after he made an oral statement but before he made a written statement does not render harmless the failure of the officers to allow L.J.V. the opportunity to communicate with his father at the time when he made the request, before his oral statement. "The cat was out of the bag" by the time L.J.V. finally saw his father.
Furthermore, the State seems to argue that L.J.V. waived his rights because he initiated conversation which led to his confession at some point when the interrogation had briefly ceased. The evidence shows that, after repeated requests by L.J.V. to see his father, followed by continued interrogation by the officers, the two officers "signaled" to each other to "go with the father." (R. 318)
Officer Taylor then left the room to supposedly get L.J.V.'s father. However, L.J.V. was not informed that Taylor was going to get his father or that he was going to be allowed to talk with his father. When Taylor left, L.J.V. went to the bathroom. When he came out of the bathroom, L.J.V. told Collier that he wanted to tell the truth and then made his oral statement.
We do not find these circumstances to constitute a valid voluntary waiver of L.J. V.'s rights.
"Whether there is a valid waiver depends upon `the totality of the circumstances':
"`This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand *246 the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights....
"`... Where the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination.' [Emphasis added.]
"Fare v. Michael C., 442 U.S. 707, at 725, 99 S.Ct. 2560, at 2572, 61 L.Ed.2d 197, at 213 (1979). It is elementary that a valid waiver must be made voluntarily, knowingly, and intelligently. See generally, Ex parte Whisenant, 466 So.2d 1006 (Ala.1985); Smith v. State, 475 So.2d 633 (Ala.Cr.App.1985)."
Smith, 484 So.2d at 561-62.
L.J.V. was 13-years-old and had completed the fifth grade at the time of this offense. The record shows that he was in the average range of intelligence but that he was placed in special education at school.
There is no indication in the record that L.J.V. had any prior experience with the juvenile system. Moreover, the record establishes that L.J.V. repeatedly attempted to invoke his right to see his parent but was not given the opportunity to do so. Certainly, under these circumstances, it is reasonable that a 13-year-old child would have assumed that he had to make a statement before he could speak with his father. We conclude, as we did in Smith, that L.J.V. did not make a knowing and intelligent waiver of his rights, and thus, his waiver was not valid or legal.
"An extrajudicial statement made by a child may be admissible if given by the child in accordance with the requirements of the constitutional and the prevailing case law as expressed by the appellate courts." Rule 21, A.R.J.P. See also Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).
L.J.V.'s statement does not fit in the above rule and, thus, his statement should not have been admitted into evidence. This case is hereby reversed and remanded to the trial court.
REVERSED AND REMANDED.
All the Judges concur.